COMMISSIONER OF BANKS *vs.* CHASE SECURITIES CORPORATION.

MARY B. BRANDEGEE *vs.* SAME.

Suffolk.    March 2, 1936. — September 18, 1937.

Present: FIELD, DONAHUE, LUMMUS, & QUA, JJ.

*Sale,* Of securities, What constitutes, Place of sale, Transfer of title, Validity, Ratification, Repudiation. *Sale of Securities Act. Conflict of Laws. Contract,* Performance and breach, Implied. *Corporation,* Transfer of shares, Dividend, "Rights." *National Bank. Constitutional Law,* Impairment of the validity of contracts. *Evidence,* Presumptions and burden of proof. *Tender. Words,* "Sale," "Direct."

Statement by FIELD, J., as to the right of a purchaser of securities sold in violation of the sale of securities act to repudiate the purchase and recover the price paid.

Evidence, that a purchaser in this Commonwealth ordered of a New York corporation at its place of business here and paid for here shares of a New York national bank, that the corporation delivered to the purchaser here a receipt of a New York depositary representing shares of the bank and its own shares in combination, the certificates for which were in the possession of the depositary, and that the purchaser accepted delivery of such receipt as performance of his order, warranted a finding that a sale of such receipt and the shares it represented took place here and was subject to G. L. (Ter. Ed.) c. 110A, although the

receipt was issued from New York and the shares had been transferred into the purchaser's name and the certificates therefor were held by the depositary in New York.

A delivery within this Commonwealth of a receipt of a depositary, which operated as an equitable assignment of corporate shares represented by such receipt, certificates for which in the assignee's name were in the possession of the depositary, was a "sale" here of "securities" within the meaning of G. L. (Ter. Ed.) c. 110A.

In order to be exempt from the application of G. L. (Ter. Ed.) c. 110A under § 3 (g) thereof, securities issued by a trust company of another State must be those "representing an interest in, or direct contract right against," the trust company.

An incidental implied contract right against a trust company of another State which held securities only as a depositary and issued a receipt for them was not such a "direct contract right" as would bring the receipt within the exemption of § 3 (g) of G. L. (Ter. Ed.) c. 110A.

That shares of corporate stock were sold, and were required by contract to be sold, only in combination with shares of a national bank did not so restrict the transferability of the national bank shares in violation of Federal law as to exempt the sale of the corporate shares, or of a receipt representing both shares, from the application of G. L. (Ter. Ed.) c. 110A.

Although shares of a national bank and of a business corporation, its affiliate, were combined by contract in 1917 to be held or sold as a unit, a sale of such a unit in 1929 was not in performance of such contract so as to be excluded by the provisions of § 2 of St. 1921, c. 499, from the application of c. 110A, added to the General Laws by § 1 of said c. 499.

The application of G. L. (Ter. Ed.) c. 110A to a sale in this Commonwealth of shares of a foreign corporation in combination with shares of a national bank did not, in violation of the Constitution of the United States, art. 1, § 10, impair the obligation of previous contracts, one of which was contained in that corporation's charter, requiring both shares to be held or sold in combination.

Compliance with § 4 of G. L. (Ter. Ed.) c. 110A requiring the filing with the commission of public utilities of a sworn statement relating to securities to be sold, was not shown by proof that information which might have been shown by such a sworn statement was in the commission's files and otherwise available to them if it did not appear that, as permitted by the statute, they had accepted the information thus in their possession in lieu of the statement required by the statute.

The burden of proving that the commission of public utilities had accepted, under § 4 of G. L. (Ter. Ed.) c. 110A, information respecting a security to be offered for sale in lieu of the statement required by that section was upon the seller.

Acceptance in this Commonwealth of delivery of a "duplex" certificate for combined shares of a foreign corporation and a national bank, as compliance with a previous purchase order made here for the national bank shares, constituted a sale here to which G. L. (Ter. Ed.) c. 110A was applicable as to the corporate shares.

The sale of stock of a nonbanking corporation and of a national bank in combination under charter and contract restrictions that neither stock could be sold separately was an indivisible transaction, and a violation of G. L. (Ter. Ed.) c. 110A as to the stock of the corporation vitiated the entire transaction.

The burden of proving that a purchaser of securities sold in violation of G. L. (Ter. Ed.) c. 110A had so conducted himself after the purchase as to preclude him from repudiating it and recovering the purchase price, was upon the seller.

A purchaser of stock sold in violation of G. L. (Ter. Ed.) c. 110A was not precluded from repudiating the purchase and recovering the purchase price by voting as a stockholder and accepting dividends without knowledge of facts showing the violation or of facts putting him on inquiry with respect thereto; he was under no duty to use diligence to discover a possible violation of the statute.

The tender necessary to entitle a purchaser of stock sold in violation of G. L. (Ter. Ed.) c. 110A to repudiate the purchase and recover the purchase price must be such as will satisfy the requirements of equity and fair dealing without denying to the purchaser the protection which the statute was intended to afford.

After a sale of stock in violation of G. L. (Ter. Ed.) c. 110A, a tender of the same shares with the benefits derived therefrom was not insufficient so as to bar an action for the purchase price because of depreciation in value, or of changes in capitalization, corporate purposes and restrictions upon the sale of the stock which became effective after the purchase.

In tendering benefits received, as a prerequisite to enforcement of a right to recover the price paid for stock sold in violation of G. L. (Ter. Ed.) c. 110A, the purchaser was not required to have exercised rights, issued by the corporation to him as a stockholder, to subscribe for stock in another corporation at a certain price and to tender stock thus procured, but properly sold the rights and tendered what was received from such sale.

A slight error in amount in tendering benefits received, as a prerequisite to enforcement of a right to recover the price paid for stock sold in violation of G. L. (Ter. Ed.) c. 110A, was waived by nonobjection.

TWO ACTIONS OF CONTRACT.  Writs in the Municipal Court of the City of Boston dated August 13, 1934.

Upon removal to the Superior Court, the actions were heard without a jury by *Weed*, J., who found for the plaintiffs in the sums, respectively, of $21,983 and $27,230 with interest.  The plaintiffs and the defendant alleged exceptions.

*J. B. Abrams,* (*T. A. Mullens & A. Garceau* with him,) for the plaintiffs.

*J. L. Hall,* (*M. Jenckes & R. Donaldson* with him,) for the defendant.

FIELD, J.   These two actions of contract, brought by writs dated August 13, 1934, were tried together by a judge of the Superior Court sitting without a jury.   The plaintiff in the first case is the commissioner of banks in possession of the Lowell Trust Company (herein referred to as the trust company).   The plaintiff in the other case is Mary B. Brandegee.   The defendant in each case is the Chase Securities Corporation, a corporation organized under the laws of the State of New York (herein referred to as the corporation).   Each action is brought to recover the purchase price of stock in the defendant corporation (together with stock of the Chase National Bank) purchased from said corporation by the trust company in the first action and the plaintiff in the second action and is based on the ground that the sale of such stock was in violation of the sale of securities act.   Each declaration is in two counts: the first, a count alleging the sale of such stock in violation of the statute; the second, a count for money had and received.   In each case the defendant pleaded a general denial and ratification.   The trial judge filed "Findings" in which he found generally for the plaintiffs, made rulings of law and specific findings of fact, and granted and denied requests for rulings made by the plaintiffs and by the defendant.   The cases come before us on the defendant's exceptions to the exclusion of evidence, to the granting of the plaintiffs' requests for rulings, to the refusal to grant requests for rulings made by it, "to the rulings of law made in . . . [the] decision and to the findings of fact therein contained so far as they are not supported by the testimony and exhibits in the cases," and to the denial of the defendant's motions to reopen the cases for the introduction of further evidence; and on the plaintiffs' exceptions to the exclusion of evidence and the denial of their requests for rulings.   The plaintiffs' exceptions are waived if the exceptions of the defendant are overruled.

The defendant's bill of exceptions contains the "Findings" of the judge and all the evidence material to the exceptions.   Most of the evidence is in effect summarized in the subsidiary findings of the judge and need not be

stated separately. Moreover, the questions of law involved in the defendant's contentions are properly raised in some form by its exceptions and discussion of specific exceptions in detail is not required.

. The transactions relied on by the plaintiffs as sales of securities took place in 1929 and 1930. In 1929 the trust company paid to the defendant, at its office in Boston, the sum of $23,350 and thereafter received four receipts of the Bankers Trust Company issued in its name, each representing twenty-five shares of the stock of the Chase National Bank (herein referred to as the bank) and twenty-five shares of the stock of the defendant. In 1930 the plaintiff Brandegee paid to the defendant at its office in Boston the sum of $30,175 and thereafter received three " 'duplex' certificates," each for one hundred shares of the bank and one hundred shares of the defendant. The documents and transactions are hereinafter more fully described. The statute in force at the time of the transactions was St. 1921, c. 499, § 1, which added to the General Laws a new chapter — c. 110A — and became effective August 26, 1921, with amendments thereto made prior to the time of these transactions. The statute as so amended is embodied in G. L. (Ter. Ed.) c. 110A, and is referred to herein as the sale of securities act. By St. 1932, c. 290, the General Laws were amended by striking out c. 110A and inserting a new chapter in place thereof. It is not contended in these cases that the liabilities of the defendant are affected by this amendment. See, however, *McGray* v. *Hornblower, post,* 334. G. L. (Ter. Ed.) c. 110A prohibits the sale of certain securities unless statements, as therein described, have been filed with the commission of public utilities. Significant portions of this chapter are set out in a footnote.* Section 4 applies to a "security . . . that has been

---

* G. L. (Ter. Ed.) c. 110A, § 2 (c): " 'Security' shall include any bond, stock, certificate under a voting trust agreement, treasury stock, note, debenture, certificate in or under a profit sharing or participation agreement, subscription or reorganization certificate, oil, gas or mining lease or certificate of any interest in or under the same, evidence of indebtedness, any form of commercial paper, currency of any government other than the United States, or any certificate or instrument representing or secured by an interest in the capital, assets or property of any corporation, unincorporated organ-

sold in this commonwealth prior to June first, nineteen hundred and twenty-one," and § 5 applies to a security "to which the preceding section does not apply." In each case the judge found that the Bankers Trust Company receipts were sold in the Commonwealth prior to June 1, 1921, and ruled, at the request of the defendant, that "there is no cause of action arising out of § 5." The general findings for the plaintiffs, therefore, are based upon § 4.

The general and special findings in each case are to stand if warranted upon any possible view of the evidence and not vitiated by error of law. And the general finding imports findings of fact, so far as warranted by the evidence, not inconsistent with the special findings. *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 143. *Assessors of Boston* v. *Garland School of Home Making*, 296 Mass. 378, 384.

It is settled by our decisions that — subject to limita-

---

ization, association, trust or public corporation or body," and (d): " 'Sale' or 'sell' shall include the issuance of securities, an agreement whereby a person transfers or agrees to transfer an interest in securities, and an exchange, pledge, hypothecation, or any transfer in trust or otherwise, by way of mortgage. Any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value. 'Sale' or 'sell' shall also include an attempt to sell, an option of sale, a solicitation of a sale, a subscription or an offer to sell, directly or by an agent, or by a circular, letter, advertisement or otherwise"; § 3: "Except as hereinafter provided, the provisions of this chapter shall not apply to . . . (g) Securities issued by, and representing an interest in, or direct contract right against, any national bank or corporation created or existing by virtue of the acts of the congress of the United States; or by any state bank, trust company, co-operative bank, or credit union of this commonwealth, or of any other state where the same is fully organized, doing business and is under the supervision of the public official controlling banking in such state; or the securities of any corporation under the supervision of the department of banking and insurance of this commonwealth, other than corporations licensed to make small loans"; § 4: "No security not exempted from the provisions of this chapter under the preceding section, that has been sold in this commonwealth prior to June first, nineteen hundred and twenty-one, shall be sold after six months following the effective date of this chapter or after such further time as the commission may prescribe, unless and until there shall have been filed with the commission by a person offering the same for sale or by the directors or trustees of the corporation, association, trust or other body issuing the security or other officers holding a corresponding relation thereto, or by officers duly authorized by such directors or trustees to take such action, a statement" containing certain information relative to the security; § 6A: "The commission may also require any person offering any security for sale, or the directors, trustees or corresponding officers of the corporation, association, trust, or other body issuing the security, the sale of which is otherwise lawful under this chapter, to file, in such form as it may from time to time prescribe, periodic statements" of financial condition.

tions not here material, see *Norwood Trust Co.* v. *Twenty-four Federal Street Corp.* 295 Mass. 234 — a purchaser through the medium of a "sale," as defined in the statute and subject to its provisions, of a "security," so defined and subject, in violation of such provisions, can maintain an action at law against the seller to recover the price paid for such security (*Kneeland* v. *Emerton,* 280 Mass. 371, *Bauer* v. *Bond & Goodwin Inc.* 285 Mass. 117, 120, *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156, 160), provided the purchaser, after acquiring full knowledge of material facts, has not chosen to continue to hold this security and deal with it as his own (*Cummings* v. *Hotchkin Co.* 292 Mass. 78, 81, *Goodwin* v. *Simpson,* 292 Mass. 148, 155), but makes a proper tender to the seller of the security and the benefits derived therefrom.   *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156, 159.   *Norwood Trust Co.* v. *Twenty-four Federal Street Corp.* 295 Mass. 234, 236.   The right to recover the consideration paid, though the transaction is illegal and fully executed, rests on the ground that the purchaser belongs to the class of persons which the statute aims to protect, that the prohibition of the statute does not apply to the purchaser but applies only to the seller, and that the purchaser does not participate in the wrongdoing with full knowledge of material facts.   *Kneeland* v. *Emerton,* 280 Mass. 371, 378–379, 383.   *Goodwin* v. *Simpson,* 282 Mass. 148, 155.   See Williston on Contracts, § 1789; Am. Law Inst. Restatement: Contracts, § 604.   This ground of recovery fails when the purchaser, after acquiring such knowledge, continues to hold the security and to deal with it as his own.   *Cummings* v. *Hotchkin Co.* 292 Mass. 78, 81.

First.   The finding in each case — express or implied — that there was a violation of the sale of securities act was not vitiated by error of law.

There was evidence that on March 21, 1917, the bank was capitalized at $10,000,000, consisting of one hundred thousand shares of the par value of $100 each.   Findings of the judge bearing on the original transactions and the subject matter thereof — as to which there is no controversy

— included the following: The defendant corporation "was organized under the Business Corporation Law of New York on May 26, 1917," by a committee of stockholders of the bank. Its charter "is comprehensive in its scope and includes dealing in securities. No par value shares to the number of 100,000 were to be issued. The amount of its capital with which to carry on business was fixed at $2,500,-000 and the consideration for which it might issue and sell its authorized shares, at $25 a share in cash or its equivalent in property. Express provision is made that no share of the Corporation issued to a stockholder of the Bank as such, or any interest therein, shall 'be sold, pledged or otherwise disposed of or transferred, either voluntarily, by operation of law or otherwise, except in each instance and from time to time together with a transfer to the same person or persons of a like interest in an equal number of shares of stock of said Bank. The sale, pledge or other disposition or transfer of any shares of stock of the Bank or any interest therein, either voluntarily, by operation of law or otherwise, by or in behalf of any such stockholder of the Bank or anyone claiming from or through such stockholder, either directly or by mesne transfers shall, if and to the extent that effect may then be given by law to this provision, operate ipso facto as a transfer to the same person or persons of a like interest in an equal number of shares of the stock of this corporation.' It is also provided expressly that all receiving shares of the stock of the Corporation as stockholders of the Bank, and those claiming under or through them, irrevocably designate and appoint the 'depositary with which shares of this corporation and of the Bank are deposited to insure their transfer together . . . their agent, in case of the sale, pledge, or other disposition or transfer of a share or shares of said stock of the Bank or of this corporation, or any interest therein, . . . to transfer to the same person or persons a like interest in an equal number of shares of this corporation or of the Bank, as the case may be, and to do and perform any and all acts to effectuate such transfer.' It [is] provided further that the foregoing provisions may be modified or terminated by

the affirmative action of the registered holders of at least seventy-five per cent (later changed to 66⅔) of the shares of stock of said Bank and of the Corporation then outstanding and so deposited; also that the foregoing provisions shall be stated in the certificates of stock of the Corporation.

"Prior to the organization of the Corporation, an agreement . . . [herein referred to as the deposit agreement] dated March 21, 1917, had been entered into between all the stockholders of the Bank, a Committee of such stockholders and the Bankers Trust Company of New York. . . . Pursuant to the terms of this agreement, all of the certificates of the outstanding stock of the Bank had been deposited with the Committee. The Bank paid a special dividend of $25 a share to the stockholders of the Bank, which was received by the Committee. With the $2,500,000 so received, the Committee paid the Corporation for the 100,000 shares of its stock then to be issued. The Committee, under authority from the depositing stockholders, caused certificates of the Corporation to be issued in the respective names and in the respective numbers of shares owned by the depositing stockholders of the Bank and caused said certificates to be deposited with the Bankers Trust Company along with said shares of the Bank which had been deposited with the Committee and were held by said [Bankers] Trust Company as depositary for the Committee. As occasion called for the transfer of such shares from the names in which they stood when so deposited, new certificates were issued. These new certificates are printed on the same sheet, on one half a certificate for shares of the stock of the Bank and on the other half a certificate for shares of the stock of the Corporation. . . . On the reverse side of the sheet, opposite the respective certificates, are the usual printed forms for the transfer thereof. The Bankers Trust [Company] issued to the depositing stockholders of the Bank receipts for stock of the Bank and of the Corporation, pursuant to the terms of the agreement of March 21, 1917. . . . Such receipts provide expressly — 'Neither said shares of the Bank nor said shares of the Securities Corporation are transferable separately, but this receipt and all rights and interests

represented hereby are transferable by the registered holder, either in person or by attorney duly authorized, on the books of the Depositary kept for that purpose, upon surrender of this receipt duly assigned, which assignment shall transfer all right, title and interest of the Depositor in the Deposited Shares. By delivering this receipt to the Depositary for transfer the holder hereof irrevocably constitutes and appoints the Depositary attorney to surrender the certificates for the Deposited Shares and to receive from the Bank and from the Securities Corporation respectively in exchange therefor certificates of stock for the Deposited Shares registered in the name of the transferee hereof as entered upon the records of the Depositary, and hereby irrevocably authorizes the Depositary to hold the same subject to the provisions of the Deposit Agreement.' On the back of each trust receipt is a printed blank, for the transfer of the shares of stock of the Bank and of the Corporation 'represented by the within receipt' and appoints irrevocably Bankers Trust [Company] attorney for the person named in the receipt to transfer the certificates for said shares issued respectively by the Bank and by the Corporation. The form includes also a transfer of the receipt 'and all rights and interests represented thereby.'

"Bankers Trust [Company] receipts were . . . delivered to the stockholders of the Bank according to the number of shares owned and deposited by each. Thereafter as the capital stock of the Bank was increased from time to time, a like number of shares was authorized and issued by the Corporation. Certificates for the new shares of the Bank and Corporation respectively were deposited with the Bankers Trust [Company], and receipts therefor issued to the persons entitled thereto. . . .

"Between 1917 and January 1930 certificates of shares of the Bank and of the Corporation issued in the names of the persons designated in the outstanding Bankers Trust [Company] receipts were at all times in the custody of the Bankers Trust [Company] in New York. When such an outstanding receipt was transferred and surrendered by the transferee to the Bankers Trust [Company], the certifi-

cates for the shares of the Bank and of the Corporation represented by the surrendered receipt were transferred by the Bankers Trust [Company], under the power contained in the 1917 agreement, to the transferee of the receipt, certificates for shares of the Bank and of the Corporation being issued to the transferee and deposited with the Bankers Trust [Company], and the latter issued to the transferee a receipt therefor in the form already described. The persons in whose names stood the shares deposited with the Bankers Trust [Company] and represented by the outstanding Bankers Trust [Company] receipts, were at all times recognized by the Bank and by the Corporation as their respective stockholders of record entitled to vote the same and to all dividends declared with respect thereto. . . .

"By an agreement dated January 15, 1930, between the Bankers Trust Company and the holders of its said receipts . . . for the purpose of eliminating the expense incident to the use of such receipts, provision was made for the withdrawal of said receipts and the substitution therefor of new 'unit' or 'duplex' certificates issued respectively by the Bank and by the Corporation to their stockholders. On the face of each such document there is printed a certificate for shares of the Bank, and on the reverse side a certificate for shares of the Corporation, with one printed transfer form covering the shares of both, each bearing a legend restricting the holder from selling, pledging or otherwise disposing or transferring, 'any share or interest therein in either corporation without at the same time transferring to or vesting in the same party an equal number of shares, or the same interest therein, in the other.' . . . Thereafter the Bankers Trust [Company] receipts were retired, and in place thereof each stockholder received a new 'unit' or 'duplex' certificate for the shares of the Bank and of the Corporation respectively owned by him."

A. We consider first the case of the trust company.

The findings of the trial judge applicable specifically to this case include the following: "It is uncontroverted that the Lowell Trust Company purchased of the Corporation through its Boston office, on September 10, 1929, 100 shares

Chase National Bank for $23,350, and a confirmation . . . was sent by the Corporation's Boston office . . . [In this confirmation "the subject of the transaction is described — '100 Sh. Chase National Bank stock' and the . . . [trust company] is notified 'In accordance with your instructions, we have bought for your account the above mentioned securities.'"] The . . . [trust company] paid for said shares forthwith. The confirmation was receipted by the Corporation and returned to the . . . [trust company]. A few days later the . . . [trust company] received four Bankers Trust [Company] receipts, issued in its name, each representing 25 shares of the stock of the Bank and 25 shares of the stock of the Corporation . . . The underlying certificates issued to the . . . [trust company] as of the same date as the Bankers Trust [Company] receipts . . . retained on deposit by the Bankers Trust [Company], were in evidence . . . also a so called 'unit' or 'duplex' certificate . . . for 100 shares each of the Bank and of the Corporation issued to and accepted by the . . . [trust company] in October 1930 upon its surrender of the Bankers Trust [Company] receipts." It is evident that the word "purchased" does not include delivery or issuance of certificates and that the finding with reference to the issuance of "underlying certificates" relates to a transaction in the State of New York such as already has been described.

The sale of securities act clearly does not apply to a sale of stock of the bank considered independently. G. L. (Ter. Ed.) c. 110A, § 3 (g). The statute was violated, if at all, by the sale of Bankers Trust Company receipts or of stock of the defendant corporation. The defendant contends, on the following grounds, that there was no violation of the statute: (a) No sale of either Bankers Trust Company receipts or stock of the corporation took place in the Commonwealth, (b) A sale of Bankers Trust Company receipts was exempt by § 3 (g) from the application of the statute, (c) A sale either of Bankers Trust Company receipts or of stock of the corporation, in the circumstances shown, was so related to a sale of stock of the bank that the statute

could not apply to the sale of Bankers Trust Company
receipts or of stock of the corporation without restrict-
ing the transferability of stock of the bank in violation of
Federal law, (d) Such a sale was excluded from the appli-
cation of the statute by St. 1921, c. 499, § 2, because made
in performance of the contract of March 21, 1917 — the
deposit agreement — and of the contract embodied in the
charter of the corporation, and also (e) because the appli-
cation of the statute to such a sale would impair obligations
of contracts contained in the deposit agreement and the
charter, in violation of the Constitution of the United
States, art. 1, § 10, and (f) Even if the statute applies to a
sale which took place in this Commonwealth the provisions
thereof were complied with.

1. At the threshold of the case lie the questions whether
a sale of securities took place in this Commonwealth and,
if such a sale took place, what securities were sold.  It
could be found that a sale of Bankers Trust Company
receipts took place here.  And the judge ruled correctly
that a "sale of Bankers Trust [Company] receipts was . . .
a sale of the shares of the Bank and of the Corporation
represented thereby."

It is not disputed that the original negotiations between
the trust company and the defendant, including payment
by the trust company to the defendant, took place in this
Commonwealth and related solely to stock of the bank
but not to any particular shares thereof.  There was evi-
dence — and apparently it is not disputed — that, not-
withstanding the form of the "confirmation," the relation
between the trust company and the defendant was that of
buyer and seller (or dealer) rather than that of principal
and agent.  Compare *Gill* v. *Hornblower,* 294 Mass. 26.
Clearly the defendant by the transaction came under some
liability to the trust company.  It is immaterial for present
purposes whether the defendant became liable as a debtor
to repay the purchase price if the stock was not delivered,
or became bound by contract to deliver stock so as to be
liable to pay damages for nondelivery or even to be com-
pelled to perform specifically.  See *Coolidge* v. *Old Colony*

*Trust Co.* 259 Mass. 515, 522; *Goodhue* v. *State Street Trust Co.* 267 Mass. 28, 42–43.

Furthermore, it is not disputed that Bankers Trust Company receipts representing the number of shares of bank stock covered by the previous transaction and a corresponding number of shares of stock of the corporation were delivered to the trust company and accepted by it in this Commonwealth. The defendant argues, however, that if any sale of securities resulted it was made in New York where receipts of a former owner were surrendered to the Bankers Trust Company for transfer, stock of the bank and stock of the corporation were transferred into the name of the trust company and the certificates representing such stock were deposited with the Bankers Trust Company. This contention cannot be sustained.

The original transaction — as could have been found — did not contemplate a purchase of Bankers Trust Company receipts, of stock of the bank limited as to transferability as provided in such receipts and the deposit agreement, or of stock of the corporation. Delivery — and, *a fortiori*, appropriation to the use of the trust company other than by delivery — of any or all of these things would not be performance of the previous agreement and would not discharge the defendant from its liability thereunder (*Gardner* v. *Lane*, 12 Allen, 39, *Folsom* v. *Ballou Banking Co.* 160 Mass. 561, *Newhall* v. *Enterprise Mining Co.* 205 Mass. 585, *Shea* v. *Manhattan Life Ins. Co.* 224 Mass. 112, Am. Law Inst. Restatement: Contracts, § 386), though such liability might be discharged by acceptance by the plaintiff of any such things. It could have been found, however, that there was no such acceptance by the trust company until it received the receipts in this Commonwealth. But a finding was warranted that the trust company accepted such receipts in discharge of the defendant's liability arising out of the previous transaction — that is, that the delivery of the receipts constituted an offer by the defendant to exchange the receipts, and the rights represented thereby, for the discharge of the defendant's preexisting liability, and that this offer was accepted by the

trust company when it accepted the receipts. Since the last act necessary to make the agreement binding was done here its validity and effect were determined by the law of this Commonwealth. Am. Law Inst. Restatement: Conflict of Laws, §§ 323, 325, 332. Beale, Conflict of Laws, §§ 311.1, 323.1, 325.1, 332.29. *Brocalsa Chemical Co.* v. *Langsenkamp,* 32 Fed. (2d) 725, 729. See *Carmen* v. *Higginson,* 245 Mass. 511, 516. The transaction took place here and was subject to the law of this Commonwealth.

The acts in the State of New York relied on by the defendant, including the transfer of stock into the name of the trust company and the deposit of the certificates representing such stock with the Bankers Trust Company, when done, were not authorized by the plaintiff. The Bankers Trust Company had not then become, by reason of the trust company's acceptance of its receipts, the agent of the trust company. Doubtless legal title to stock of the corporation and to stock of the bank would pass in the State of New York by delivery to the trust company in that State of certificates representing such stock issued in the name of the trust company. The corporation was incorporated in the State of New York and by the law of that State title to a certificate and the shares represented thereby would pass by "delivery of the certificate indorsed either in blank or to a specified person." N. Y. Consol. Laws (1930) c. 42, art. 6, § 162. *Disconto-Gesellschaft* v. *United States Steel Corp.* 267 U. S. 22, 28–29. *Hutchison* v. *Ross,* 262 N. Y. 381, 390–391. Am. Law Inst. Restatement: Conflict of Laws, § 53. See also G. L. (Ter. Ed.) c. 155, § 27; *Stuart* v. *Sargent,* 283 Mass. 536, 540–541. A similar principle applies to stock of a national bank. *Johnston* v. *Laflin,* 103 U. S. 800, 804. In this case, moreover, the transfers apparently were registered on the books of the bank and of the corporation. Prior, however, to delivery of the Bankers Trust Company receipts in this Commonwealth there was no delivery to the trust company or its agent of certificates of stock of the bank or of the corporation. And it could have been found that prior to the delivery of the receipts the trust company acquired no legal or equitable

title to such certificates or to the shares represented thereby. See *Levey* v. *Nason*, 279 Mass. 268; *Stuart* v. *Sargent*, 283 Mass. 536, 538, 541–542; *Finn* v. *Brown*, 142 U. S. 56, 67. Acceptance of these receipts by the trust company may have amounted to ratification of the previous transfers in the State of New York. Am. Law Inst. Restatement: Conflict of Laws, § 331. But the fact that the transaction in this Commonwealth related to stock represented by certificates in the name of the trust company and had the effect of ratifying previously unauthorized transfers in another State would not deprive the Commonwealth of power to regulate such transaction. The transaction did not relate to property, title to which had already passed to the trust company in another State.

The Bankers Trust Company receipts were not negotiable instruments. Nor were they certificates of stock subject to the uniform stock transfer act. See G. L. (Ter. Ed.) c. 155, § 26. N. Y. Consol. Laws (1930) c. 42, art. 6, § 183. By the terms of the deposit agreement such receipts were transferable on the books of the Bankers Trust Company. But since the receipts had already been placed in the name of the trust company they were assignable to it by delivery. The transaction here, therefore, was in the nature of an assignment by the defendant to the trust company of the receipts and of the rights represented thereby, and the effect of the assignment as between the trust company and the defendant depended on the law of this Commonwealth. Am. Law Inst. Restatement: Conflict of Laws, §§ 350–352. See *Wilde* v. *Wilde*, 209 Mass. 205, 207. The receipts represented interests in the stock of the bank and of the corporation. See *Coolidge* v. *Old Colony Trust Co.* 259 Mass. 515, 521. By the assignment of these receipts there was an equitable assignment here of the stock of the bank and of the corporation from the defendant to the trust company (see *Mutual Life Ins. Co.* v. *Allen*, 138 Mass. 24, 28; *Stuart* v. *Sargent*, 283 Mass. 536, 542; *Leyson* v. *Davis*, 170 U. S. 36, 40), whatever the nature of the trust company's title thereto after the assignment by reason of the fact that the certificates of such

stock were in its name. These certificates clearly were securities within the meaning of the sale of securities act. G. L. (Ter. Ed.) c. 110A, § 2 (c). The receipts also were such securities. They were securities in form. See *Lederer* v. *Fidelity Trust Co.* 267 U. S. 17; *Title Guarantee & Trust Co.* v. *Bowers*, 67 Fed. (2d) 892, 893. And they represented, though indirectly, "an interest in the capital" of the bank and of the corporation. See § 2 (c). An assignment such as is here described could be found to be a "sale," within the broad meaning of the word as defined by the sale of securities act (see § 2 [d]), in this Commonwealth of the receipts and the certificates of stock of the bank and of the corporation.

2. The defendant contends that the Bankers Trust Company receipts were securities of a trust company excluded from the application of the sale of securities act by G. L. (Ter. Ed.) c. 110A, § 3 (g), which excludes from such application "Securities issued by, and representing an interest in, or direct contract right against, any national bank or corporation created or existing by virtue of the acts of the congress of the United States; or by any . . . trust company . . . of this commonwealth, or of any other state where the same is fully organized, doing business and is under the supervision of the public official controlling banking in such state." It is not disputed that the Bankers Trust Company was a "trust company of the State of New York, fully organized, doing business, and under the supervision of the public official controlling banking in said State." The judge, by granting requests made by the defendant, ruled, in substance, that the receipts were "se‧ curities" "issued" by the Bankers Trust Company. The deposit agreement and receipts issued thereunder were in evidence and there was testimony of a member of the New York bar "setting out specifically certain contractual rights of holders of said receipts against the Bankers Trust [Company] arising out of the [deposit] agreement . . . under the laws of New York where that agreement was made." The judge ruled, however, that "such contractual rights arise merely by implication of law out of the Bankers . . .

[Trust Company's] duties as depositary and do not represent such direct contractual rights against the Bankers Trust [Company] as bring the receipts under the exemption of this clause."

The defendant attacks this ruling on the ground that the phrase of G. L. (Ter. Ed.) c. 110A, § 3 (g), "representing an interest in, or direct contract right against," does not apply to securities issued by a trust company organized under the law of another State. The clause of the section dealing with trust companies of other States contains no description of the securities to which it applies. Such a description must be read into the clause by implication from the other language of the section. Perhaps a strictly grammatical construction would permit the insertion in the clause, by implication, only of the words "securities issued" between the words "or" and "by." The language of the section as a whole, however, indicates that the securities of trust companies and other corporations of other States to which the clause was intended to apply are securities of the same nature as the securities of corporations of the United States described in the preceding clause. No reason for a broader exemption of securities of corporations of other States is apparent. We think such a broader exemption cannot rightly be based upon a technicality of grammatical construction (see *Greenough* v. *Phoenix Ins. Co.* 206 Mass. 247, 251; *Central Trust Co.* v. *Howard,* 275 Mass. 153, 158), and that the receipts issued by the Bankers Trust Company were not exempt from the application of the statute unless they represented "an interest in, or direct contract right against" that trust company.

The defendant contends further that the ruling of the trial judge was wrong for the reason that these receipts represented a "direct contract right against" the Bankers Trust Company. (It is not contended that the receipts represented "an interest in" that trust company.) The Bankers Trust Company is named in the deposit agreement as a party thereto, and the deposit agreement is executed by that trust company, but the express agreements therein contained are all agreements of the stockholders of the bank

or of a committee of such stockholders.  The deposit agreement refers, however, to the Bankers Trust Company as "the Depositary" and provides for deposit with it of certificates representing the stock of the bank and the stock of the corporation, the issuance by the depositary of receipts for such certificates, the transfer of such receipts by the depositary, the authorization of the depositary to act as attorney for the receipt holders in the transfer of stock of the bank and of the corporation, and the delivery of certificates of such stock to receipt holders upon the termination of the deposit agreement.  The receipts are executed by the Bankers Trust Company and recite that certificates of stock of the bank and of the corporation have been received by the Bankers Trust Company as depositary under the deposit agreement and are held by it pursuant to the terms of such agreement. Though the deposit agreement contains no express agreements by the Bankers Trust Company, clearly that trust company by assenting to the deposit agreement, receiving certificates of stock and acknowledging that it had received such certificates and held them pursuant to the terms of the deposit agreement, became bound contractually to the receipt holders to deal with such certificates in the manner described by the deposit agreement.  The judge was not wrong, however, in describing the contractual rights so created as arising "merely by implication of law out of the Bankers . . . [Trust Company's] duties as depositary." Those duties were created by agreement of the parties, implied if not expressed.  The defendant's criticism of the ruling of the judge is based in part on the ground that the relation between the Bankers Trust Company and receipt holders constituted a contract implied in fact, and was not the relation sometimes described as a contract implied in law, meaning that an obligation is imposed by law independent of agreement or intention of the parties.  See Williston on Contracts (Rev. Ed.), § 3.  In either case, however, the obligation and its correlative right arise "by implication of law" from facts shown or inferred.  The judge did not purport to rule that the rights of receipt holders against the Bankers Trust Company were not contractual rights in the

true sense of the term, but ruled rather that the receipts did not represent contractual rights against that trust company which were "direct" within the meaning of the section.

This ruling was correct. The general purpose of the statute was to protect purchasers of corporate securities against fraud. *Kneeland* v. *Emerton,* 280 Mass. 371, 376, 387–388. Certain securities were excluded from the application of the statute on the assumption that such protection was furnished through methods of supervision other than those prescribed by the statute. See G. L. (Ter. Ed.) c. 110A, § 3 (d), (e), (f), (g). Report of special commission to investigate the sale of corporate securities and related matters. House Document 1921, No. 1175, pages 38, 46. The Legislature, however, was unwilling to make this assumption with reference to all securities, as defined in the statute (G. L. [Ter. Ed.] c. 110A, § 2 [c]), issued by a trust company or similar corporation and limited the exemption to securities so issued "representing an interest in, or direct contract right against" such a corporation. G. L. (Ter. Ed.) c. 110A, § 3 (g). This language must be read in connection with the statutory definition of "security" (G. L. [Ter. Ed.] c. 110A, § 2 [c]) and in the light of the reason for the exemption. Though the fact that an instrument "issued" by a trust company represented "an interest in the capital" of another corporation would bring it within the statutory definition of "security," this fact would not be sufficient to bring it within the statutory exemption. Such a security very likely might represent incidental contract rights against the trust company issuing it. But some meaning must be attributed to the word "direct" as limiting the words "contract right." With its context the word "direct" naturally imports that, as a condition of exemption, the security — if it does not represent "an interest in" the trust company — must represent a "contract right" to enforce against the trust company the primary obligation of the security and not merely incidental contract rights with respect to the management of property represented by the security. We need not determine the

extent to which a "contract right" may be restricted and still satisfy the requirements of the statute. On the documents in evidence the Bankers Trust Company receipts did not represent such a "direct contract right" against that trust company as would bring them within the exemption.

3. Neither the sale of Bankers Trust Company receipts nor that of stock of the corporation, in the circumstances shown — apart from the matter of impairment of obligations of contracts hereinafter considered — was so related to the sale of stock of the bank that the sale of securities act could not apply to the sale of Bankers Trust Company receipts or of stock of the corporation without restricting the transferability of stock of the bank in violation of Federal law.

The general principle defining the respective powers of the United States and of the several States over national banks is stated in *First National Bank in St. Louis* v. *Missouri*, 263 U. S. 640, 656, as follows: "National banks are brought into existence under federal legislation, are instrumentalities of the Federal Government and are necessarily subject to the paramount authority of the United States. Nevertheless, national banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States." See also *McClellan* v. *Chipman*, 164 U. S. 347, 357; *Lewis* v. *Fidelity & Deposit Co.* 292 U. S. 559, 566; *Jennings* v. *United States Fidelity & Guaranty Co.* 294 U. S. 216, 219. According to the statutes of the United States shares of stock of a national bank are "deemed personal property, and transferable on the books of the association in such manner as may be prescribed in the by-laws or articles of association." U. S. Rev. Sts. § 5139, as amended; see U. S. C. Title 12, § 52. This provision was "intended to afford facilities for the transfer of stock in national banks, and thereby to encourage investment in such stock." *Third National Bank of Buffalo* v. *Buffalo German Ins. Co.* 193

U. S. 581, 592. A State statute restricting the transferability of stock of national banks might "interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States," and consequently be invalid. Whether the sale of securities act, if applicable to stock of a national bank, would be invalid as to such stock on this ground need not be decided since such stock is expressly excluded from the application of the act. G. L. (Ter. Ed.) c. 110A, § 3 (g).

The sale in this case, however, involved not only stock of the bank but also stock of the corporation which, if sold separately, would be subject to the provisions of the sale of securities act. See *Hall* v. *Geiger-Jones Co.* 242 U. S. 539; *Caldwell* v. *Sioux Falls Stock Yards Co.* 242 U. S. 559; *Merrick* v. *N. W. Halsey & Co.* 242 U. S. 568. The bank and the corporation are distinct legal organizations. *Corsicana National Bank* v. *Johnson*, 251 U. S. 68, 88–89. The corporation is not a Federal instrumentality. It was not incorporated under Federal law. On the contrary, it was organized under the law of the State of New York. And the corporation does not perform the functions of the bank. Indeed, many of its purposes are beyond the scope of the corporate purposes of the bank. U. S. Rev. Sts. § 5136, Seventh. U. S. C. Title 12, § 24. See *First National Bank of Concord* v. *Hawkins*, 174 U. S. 364, 366–367; *Awotin* v. *Atlas Exchange National Bank of Chicago*, 295 U. S. 209. Doubtless it was incorporated in order to do business which the bank could not do. By reason of identity of stock ownership the corporation was a so called "affiliate" of the bank. Though in considering the effect of intercorporate dealings the identity of stock ownership is not to be overlooked (*Corsicana National Bank* v. *Johnson*, 251 U. S. 68, 89), the corporation for the purpose of State regulation stands on the footing of a State corporation. The Federal banking act of 1933 so recognizes. Its provisions for examination and reports of condition of affiliates of national banks are enforced through the banks with which they are affiliated,

and which are subject to Federal regulation. Act of June 16, 1933, c. 89, §§ 5 (c), 27, 28 (a), (b); 48 U. S. Sts. at Large, 164, 165, 166, 191, 192; U. S. C. Title 12, §§ 334, 338, 161, 481.

The question presented is whether the sale of securities act applies to a sale of stock of the corporation in combination with stock of the bank. Such a sale is not within any express exemption contained in the act itself. See G. L. (Ter. Ed.) c. 110A, § 3 (g). And no Federal statute purports specifically to exempt from the application of such a State statute securities sold in combination with stock of a national bank. The exemption — if any exists — must be implied on the ground that the sale of securities act cannot be applied to such a sale without unduly restricting the transferability of the stock of the bank.

The sale of securities act is applicable to the sale "in so far as it is consistent with the policy or provisions, express or reasonably implied, of the National Bank Act or of other federal acts of paramount authority." *Jennings* v. *United States Fidelity & Guaranty Co.* 294 U. S. 216, 219. The purpose of the sale of securities act is "to protect people from fraud in the purchase of corporate securities." *Kneeland* v. *Emerton*, 280 Mass. 371, 387–388. And securities do not fall outside this purpose because sold in combination with national bank stock. Exclusion from the application of the act of a sale of securities otherwise subject to its provisions merely because they are sold in combination with stock of a national bank would supply a ready means of evading the provisions of the act. We do not think that the Federal policy of encouraging investment in national bank stock and, to that end, of providing for free transferability of such stock, goes so far as to render sales of securities in combination with such stock immune from reasonable State regulation, at least in the absence of unusual circumstances. Even if the Federal government has the power to grant such immunity as an incident of its power over national banks the exercise of such power is not to be implied. See *McClellan* v. *Chipman*, 164 U. S. 347; *First National Bank in St. Louis* v. *Missouri*, 263

U. S. 640. It is not to be supposed that the right to make
a sale of other securities in combination with national bank
stock, free from reasonable State regulations ordinarily
applicable to sales of such other securities, is essential to
the marketability of such stock.

The fact that the stock of the bank not only was actually
sold in combination with stock of the corporation, but, by
reason of the provisions of the deposit agreement and of the
corporation's charter, could have been sold only in such
combination does not take the case out of the general rule.
This limitation upon the separate sale of stock of the bank
was not imposed by Federal law or even by contract of
the bank. The application of the sale of securities act to
the sale of stock of the bank and stock of the corporation
in combination, therefore, would not interfere with the per-
formance of any contract to which the bank was a party.
The limitation was imposed by the stockholders of the
bank — obviously for the purpose of making the corpora-
tion an affiliate of the bank — and could have been removed
by them. We assume that prior to the effective date of.
the prohibition by the (Federal) banking act of 1933 (Act
of June 16, 1933, c. 89, § 18; 48 U. S. Sts. at Large, 186;
U. S. C. Title 12, § 52; see also banking act of 1935, Act
of August 23, 1935, c. 614, § 310 [a]; 49 U. S. Sts. at Large,
710), such a limitation would not be in violation of Federal
law. But, even if a Federal policy, prior to that date, of
permitting affiliation of national banks with State corpo-
rations in this manner is to be implied, it is also to be im-
plied that, notwithstanding the affiliation, a corporation so
affiliated with a national bank shall remain subject to the
reasonable State regulations ordinarily applicable to such
a corporation. Such restriction of transferability of national
bank stock as results from the application of the sale of
securities act to stock of a State corporation affiliated with
a national bank is a natural incident of the limitation
imposed by the stockholders upon separate transfer of the
bank stock for the purpose of effecting the affiliation. We
think that this incidental restriction does not require exemp-

tion of the stock of the corporation from the provisions of the sale of securities act.

The principles stated in their application to the transaction considered as a sale of stock of the corporation in combination with stock of the bank apply equally to the transaction considered as a sale of Bankers Trust Company receipts representing stock of the corporation and of the bank.

4. The defendant's contention that the transaction in question was excluded from the application of the sale of securities act by St. 1921, c. 499, § 2, cannot prevail. This section is as follows: "This act shall not apply to sales, contracts, or agreements made prior to its effective date, or be construed to prohibit the performance of any such contracts or agreements, either by the issuance of stock or otherwise, provided such contracts or agreements were valid and binding upon the parties thereto by the law as it existed at the time such contracts or agreements were made."

This section — which was not embodied in G. L. (Ter. Ed.) c. 110A — must be interpreted in the light of the entire statute of which it was a part. See St. 1921, c. 499. The statute prohibited certain sales of securities unless the requirements thereof were met. The prohibition extended, however, not only to completed sales, but, by force of the broad definition of the word "sale," to "the issuance of securities" and "an agreement whereby a person transfers or agrees to transfer an interest in securities," as well as to other acts some of which fall short of being "valid and binding" "contracts or agreements." See G. L. (Ter. Ed.) c. 110A, § 2 (d), added to General Laws by St. 1921, c. 499, § 1. According to the natural interpretation of the statute as a whole the "sales, contracts, or agreements" referred to in the first clause of St. 1921, c. 499, § 2, are those which, except for the time when made, are within the general scope of the statutory prohibition. The exception from this prohibition is not to be construed more broadly than the prohibition. See *Commonwealth* v. *Welosky*, 276 Mass. 398,

401–402. And "such contracts or agreements," referred to in a later clause of the section, obviously are "such" as are referred to in the earlier clause, that is, "contracts, or agreements" within the general scope of the statutory prohibition. The reference in the section to performance of "such contracts or agreements" "by the issuance of stock or otherwise" is consistent with this interpretation, since "the issuance of securities" is specifically included with other acts in the class of prohibited sales.

A single transaction might include two (or even more) prohibited elements, as, for example, both a contract or agreement of sale and a completed sale. Even apart from the provisions of § 2 the statute could not rightly be interpreted as prohibiting a transaction completed before its effective date. See *Haverhill* v. *Marlborough*, 187 Mass. 150, 155; *Wynn* v. *Assessors of Boston*, 281 Mass. 245, 249. But a more difficult question would arise as to the application of the statute where one prohibited element of a transaction occurred prior to its effective date, and another after that date. The apparent purpose of § 2 was to deal with this situation by excluding from the application of the statute transactions within the general scope of the statutory prohibition which, having reached the point of valid and binding contracts or agreements before the effective date of the statute, were completed by performance after that date. The fact that a section similar to § 2 relating to "sales, contracts or agreements made prior to August twenty-sixth, nineteen hundred and twenty-one," and to "the performance of any such contracts or agreements" was incorporated in St. 1932, c. 290 (see § 3) does not militate against the construction here given to St. 1921, c. 499, § 2. It was not unlikely that "contracts or agreements," as the words are here construed — particularly contracts for the "issuance of stock" — made before August 26, 1921, might remain unperformed after St. 1932, c. 290, became effective.

The sale here in question was not a sale, contract or agreement made prior to the effective date of St. 1921, c. 499, nor was it performance of any contract or agreement

made prior to that date, within the meaning of § 2 as here construed. The transaction between the trust company and the defendant was not begun until 1929. The sale to the trust company was not performance of any contract contained in the corporation's charter or in the deposit agreement, though it conformed to the requirements thereof. The trust company was not a party to these contracts until it purchased the Bankers Trust Company receipts. Whatever may have been true of these contracts as between the original parties thereto, so far as they related to the sale to the trust company of Bankers Trust Company receipts and stock of the corporation and of the bank they were not within the general scope of the statutory prohibition. No one was bound by these contracts to make the sale in question. These contracts merely prescribed methods of transfer and imposed restrictions on the sale and transfer of the securities.

Doubtless a reason for the express exceptions from the statutory prohibition was to preclude an application of the statute which would impair any obligation of contract in violation of the Constitution of the United States, art. 1, § 10. The Legislature, however, did not see fit to leave the exceptions specifically described in § 2 to be determined on the basis of constitutional right, but laid down a rule presumably easier of administration. Indeed it may be that the express exceptions are broader than the scope of the constitutional protection. On the other hand the statute cannot be applied so as to impair the obligation of a contract not within the express exceptions properly construed. In the case of such a contract the statute is inapplicable, not by reason of the express exceptions, but rather by reason of an exception implied from the constitutional limitation. *Woods* v. *Woburn*, 220 Mass. 416, 421. See *Magee* v. *Commissioner of Corporations & Taxation*, 256 Mass. 512, 518. By express statutory provision an implied exception of this nature does not invalidate the statute as applied to other "persons or circumstances." G. L. (Ter. Ed.) c. 110A, § 16. Whether such an exception from the application of the statute is to be implied in this case to avoid danger of con-

flict with this constitutional limitation is considered later. See *Kennedy* v. *Commissioner of Corporations & Taxation,* 256 Mass. 426, 430.

5. The application of the sale of securities act to the sale in question would not impair the obligation of any contract contained in the charter of the corporation or in the deposit agreement, in violation of the Constitution of the United States, art. 1, § 10.

The obligations of these contracts which the defendant contends would be impaired by the application of the act to the sale in question are the obligations to sell stock of the bank or of the corporation only in combination with a like number of shares of the other stock. The stock of the corporation, which was a New York corporation, was issued in that State and these contracts were made there, before the effective date of the sale of securities act. The sale in question was made in this Commonwealth after that date. Though the stock of the corporation was issued in another State, sales thereof within the Commonwealth were subject to reasonable regulation by this State for the protection of the public against fraud. *Hall* v. *Geiger-Jones Co.* 242 U. S. 539. *Merrick* v. *N. W. Halsey & Co.* 242 U. S. 568. The application of the act to a separate sale of stock of the corporation within the Commonwealth, if such a separate sale could have been made, would have been a proper exercise of this power of regulation. The act does not apply to a sale of stock of the bank. However, as already pointed out, the incidental effect upon the stock of the bank of an application of the act to a sale of stock of the corporation in combination with stock of the bank would not exempt the stock of the corporation included in such sale from the provisions of the act.

The contention of the defendant on this branch of the case rests on the ground that the contracts requiring that stock of the corporation and of the bank be sold together were made before the passage of the sale of securities act. No contract for the sale of such stock entered into prior to that date is involved. The application of the act to a sale of stock of the corporation would not prevent the performance of the

previous contracts if the conditions of the act relating to a sale of stock of the corporation were met. Compliance with these conditions would not be a breach of either contract. Compare *Grand Trunk Western Railway* v. *Railroad Commission of Indiana*, 221 U. S. 400. And the obligations of the contracts were not impaired by imposing these conditions. The contracts do not provide that the sales contemplated thereby shall be free from such conditions. It is to be taken that the contracts were entered into subject to the proper exercise thereafter of the power of regulating sales of stock of the corporation by any State having jurisdiction over such sales. See *Opinion of the Justices*, 278 Mass. 607, 611. Moreover, neither the owners of such stock nor the corporation issuing it could remove it from the power of any such State by making a contract about it. "The contract will carry with it the infirmity of the subject matter." *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349, 357, quoted in *Boston & Albany Railroad* v. *New York Central Railroad*, 256 Mass. 600, 610. See also *Union Dry Goods Co.* v. *Georgia Public Service Corp.* 248 U. S. 372; *Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398, 437–438; *Norman* v. *Baltimore & Ohio Railroad*, 294 U. S. 240, 308. The fact that the limitation upon separate sale of the stock is contained in the charter of the corporation and consequently is a limitation imposed by the State of incorporation does not lead to a different conclusion. Very likely this is a limitation upon the power of the corporation which follows the stock into any State in which it may be sold. See Am. Law Inst. Restatement: Conflict of Laws, §§ 165, 182; Beale, Conflict of Laws, §§ 165.3, 192.5, 192.10. See also *Modern Woodmen of America* v. *Mixer*, 267 U. S. 544. But the State of incorporation by imposing this limitation does not purport to authorize sales of the stock in another State without compliance with reasonable regulations made by that State such as are contained in the sale of securities act. Nor could the State of incorporation exempt the stock of the corporation from such regulations. See Am. Law Inst. Restatement: Conflict of Laws, § 165; Beale, Conflict of Laws, §§ 167.8, 167.9, 167.10. The case at bar is materially

different from *Bedford* v. *Eastern Building & Loan Associa-
tion*, 181 U. S. 227, relied on by the defendant, and is not
governed by it.  See Beale, Conflict of Laws, § 170.2.

6. The evidence warranted a finding that the provisions
of the sale of securities act — those contained in G. L. (Ter.
Ed.) c. 110A, § 4, requiring the filing of a statement before
securities to which the section is applicable can be sold in
the Commonwealth — were not complied with before the
sale here in question, and that neither the Bankers Trust
Company receipts nor the stock of the corporation was
qualified for sale in this Commonwealth prior to that time.

G. L. (Ter. Ed.) c. 110A, § 4, required the filing of a
statement "by a person offering the same for sale or by the
directors or trustees of the corporation, association, trust
or other body issuing the security or other officers . . . on
such forms as the commission may prescribe, duly dated and
sworn to by the person or officers subscribing and filing the
same, containing . . . information and data relative to the
security" as therein described in considerable detail.

The trial judge in his findings states: "It is uncontroverted
that neither the Corporation, nor any person offering the
stock of the Corporation for sale, prior to the transactions
here in issue, had filed with the Commission a 'statement'
such as is described in Section 4 of the Act . . . unless the
circumstances about to be related constitute such a 'state-
ment'. . . . The Corporation offered and I received in evi-
dence . . . what purported to be a market letter of the
First National Corporation, dated January 8, 1929, and
bearing the Department's filing stamp of January 12, 1929.
[A copy is annexed to the bill of exceptions.]  It was found
in the Security Division's files at the time of the hearing.
It concerns the Chase National Bank and contains certain
information respecting the Corporation and its relations to
the Bank.  It contains such information as presumably the
Commission might wish to have available for the proper
discharge of its duties under the Act. . . . The letter does
not in terms or in effect amount to a 'statement' such as is
prescribed by Section 4 . . . . No evidence was offered of
what use, if any, the Commission made of the letter.  In

view of the circumstances I disregard it as evidence of a compliance with, or an excuse for noncompliance with" said section.

This treatment of the so called market letter was not error. This letter does not purport to be such a statement as is required by § 4. It was not signed or sworn to. It refers primarily to stock of the bank and only incidentally to stock of the corporation as being transferred with it — though no mention is made of the Bankers Trust Company receipts representing the stock in combination. The "information and data" contained in the letter fall far short of the requirements of § 4. Nothing in the letter tends to show that it was filed, or that the statements therein were made, by the corporation issuing the security. It can have no standing unless as a statement of the First National Corporation as a "person offering the . . . [security] for sale." Even apart from possible infirmities of proof that the letter was filed with the commission by the First National Corporation it contains nothing to show that it was filed for the purpose of qualifying the stock of the corporation for sale within the Commonwealth. Though the "statement" referred to in § 4 is not described as a "notice," the section clearly contemplates that it shall be such a statement as informs the commission that qualification of stock therein referred to is sought, and furnishes a basis for further action by the commission if deemed necessary. See § 6. The principle underlying *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156, 158, is controlling. The letter considered as a whole does not meet these requirements. The presence of this letter in the files of the commission in the circumstances shown was not evidence of compliance with the statute. See *Crean* v. *Boston Elevated Railway,* 292 Mass. 226, 228. Nor could a finding have been made that the commission, even if it had authority to do so, accepted the letter as such compliance or as an excuse for noncompliance. Consequently, as the case is presented, a finding of noncompliance with the statute was warranted.

The defendant now relies, however, on other papers in the files of the commission. These include an "Application

for Registration as Broker — Corporation" filed in 1928 by the defendant, subscribed and sworn to by its secretary, and applications filed later in 1928 and in 1929 for renewal of such registration, similarly subscribed and sworn to. These applications were admitted in evidence over the plaintiffs' objection. They had been filed with the commission for a wholly different purpose (see § 8) from that of the statement required by § 4. Whatever use the commission properly might make of the information contained in the applications in connection with a statement filed under § 4, they did not constitute such a statement or excuse the filing thereof. See *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156, 158. The defendant offered in evidence from the files of the commission a printed pamphlet entitled "Chase National Bank of the City of New York" purporting to have been filed on October 24, 1928. It contained information as to the capitalization of the corporation. This pamphlet was excluded subject to the defendant's exception. The exclusion was not error. This pamphlet had no tendency to show that the statement required by § 4 was filed or that the commission, as permitted by that section, accepted "in lieu of such statement, a reference to recognized sources of information." As tending to show that the information therein contained was in the files of the commission the pamphlet was immaterial. Though undoubtedly the purpose of the required statement is to furnish the commission with information, the mere fact that such information is in the files of the commission does not render unnecessary compliance with the statutory requirements or preclude a finding of noncompliance therewith.

A further contention of the defendant rests on the concluding sentence of § 4 which reads: "The commission may, to such extent as it deems reasonable, accept in lieu of such statement, a reference to recognized sources of information selected by the commission, containing such information and particulars as it deems sufficient." This sentence follows, as a separate and distinct provision, the provision of the section requiring that a statement be filed.

The judge stated that the defendant urged "that the

Commission had available in 1929 and 1930 Moody's and Poor's Manuals with authoritative and reliable reports concerning the Corporation containing all of the information required in the statement prescribed in Section 4 of the Act. There was offered testimony of an inspector of the Department tending to show that in 1928, 1929 and 1930 it was a practice of the Commission to accept information from such sources in lieu of statements or questionnaires such as are provided for in the Act. No evidence, however, was offered that with respect to the stock of the Corporation, to any extent whatever, specifically or by general order or rule, the Commission accepted in lieu of the statutory statement a reference to Moody's or Poor's Manuals, or either of them, for such information and particulars as it deemed sufficient. In the absence of such evidence and deeming the burden of offering it rested with the defendants, I excluded so much of these Manuals for the years 1928, 1929 and 1930 as related to the Corporation. The concluding sentence of Section 4 of the Act does not relax the earlier requirements of the section with respect to filing a statement with the information prescribed, or excuse the filing thereof, in whole or in part, without definite action by the Commission."

The record supports this description of the course of the trial. The ruling as to burden of proof was right (see *Ansell* v. *Boston*, 254 Mass. 208, 211) and the evidence, therefore, was properly excluded. It could not rightly have been inferred from the failure of the commission to take action to obtain further information about the stock of the corporation or to prevent the sale thereof that it had accepted a reference to the sources of information in question in lieu of the statement required by § 4.

B.   The case of Mary B. Brandegee.

With reference to this case the judge states "It is uncontroverted that the plaintiff purchased of the Corporation through one of its salesmen in Boston 300 shares 'Chase National Bank stock' in three lots — November 28, 1930, 100 shares — $10,075. November 28, 1930, 100 shares — 10,125. December 5, 1930, 100 shares — 9,975."

Confirmations were sent to the plaintiff in the same form as in the case of the trust company. "The plaintiff paid forthwith. The confirmations were receipted by the Corporation and returned to her. A few days later she received three of the 'duplex' certificates above described each for 100 shares of the Bank and 100 shares of the Corporation." So far as these transactions were concerned they differed from the transaction considered in the case of the trust company only in that the plaintiff received originally "duplex" certificates instead of Bankers Trust Company receipts. The contentions of the defendant in this case are the same as the contentions made in the case of the trust company already considered (except as they involve Bankers Trust Company receipts) and are disposed of by what has been said. The principles already stated are applicable to this case though "duplex" certificates were delivered to the plaintiff instead of Bankers Trust Company receipts. A finding was warranted that when this plaintiff received these certificates she accepted them in. performance of the previous agreement and that a sale then took place in the Commonwealth of stock of the corporation and stock of the bank. For reasons previously stated the finding that this sale of the stock of the corporation was in violation of the sale of securities act was not vitiated by error of law.

Second. The judge found that each sale of stock of the bank and of the corporation in combination — whether represented by Bankers Trust Company receipts or "duplex" certificates — was an indivisible transaction and ruled that the violation of the sale of securities act by the sale of stock of the corporation vitiated the entire transaction and entitled the plaintiff to rescind.

The finding that such a combined sale was an indivisible transaction was warranted either apart from or under the provision in the definition of the word "Sale" in G. L. (Ter. Ed.) c. 110A, § 2 (d), that "Any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value." The judge ruled that

this provision was applicable and the defendant has not argued that this ruling was wrong or harmful to the defendant. See *Samuel Hertzig Corp.* v. *Gibbs*, 295 Mass. 229, 232. The ruling that the illegality of the sale of stock of the corporation vitiated the entire transaction of which it was a part was right. See *Holt* v. *O'Brien*, 15 Gray, 311; *Warren* v. *Chapman*, 105 Mass. 87; *Bishop* v. *Palmer*, 146 Mass. 469, 474; *Boylston Bottling Co.* v. *O'Neill*, 231 Mass. 498, 501. Compare Am. Law Inst. Restatement: Contracts, §§ 606, 607. In each case, therefore, the plaintiff had a right to rescind — as it has been described — the transaction as a whole (see *Miner* v. *Bradley*, 22 Pick. 457, 458) and, consequently, to recover the entire consideration paid, subject to the usual conditions applicable to recovery of consideration paid for securities sold in violation of the sale of securities act. See *Kneeland* v. *Emerton*, 280 Mass. 371, 378; *Eauer* v. *Bond & Goodwin Inc.* 285 Mass. 117, 118, 120; *Cummings* v. *Hotchkin Co.* 292 Mass. 78, 81.

Third. The finding of the trial judge in each case in substance that the conditions prerequisite to maintaining an action to recover the consideration paid were met was not vitiated by error of law.

A purchaser of stock through the medium of a sale in violation of the sale of securities act "must take active steps to put himself in a position to treat his contract of purchase as void, before he can maintain his action against the seller." *Cummings* v. *Hotchkin Co.* 292 Mass. 78, 82. The purchaser may be precluded by his conduct from repudiating the transaction and for that reason cannot maintain an action. But, if not so precluded, in order to maintain an action at law "he must make a proper tender which, if accepted, would restore to the seller the securities themselves and all dividends or interest which the purchaser has received therefrom." *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156, 159.

The defendant contends that the plaintiffs cannot maintain their actions since (as it contends) (a) the plaintiffs have "ratified and confirmed their purchases so they cannot

now rescind them," (b) the defendant "cannot be restored to *status quo*" because of changes in the securities, and (c) the tenders made by the plaintiffs were insufficient.

The judge found the following facts bearing on these contentions — and there is no contention that the findings were not warranted by the evidence. In 1934 the liquidating agent of the commissioner of banks in behalf of the commissioner tendered to the corporation at its offices in New York "the Lowell Trust's 'duplex' certificates . . . for 100 shares each of the Bank and of the Corporation, duly indorsed in blank, the sum of $1,367 in legal tender and sufficient Federal and State stamps to cover the transfer taxes." The tender was refused. An attorney for Mary B. Brandegee, on or about August 1, 1934, in like manner "tendered the plaintiff's certificates with transfers duly indorsed in blank of the shares respectively of the Bank and of the Corporation, the sum of $2,886 in legal tender and sufficient Federal and State stamps to cover the transfer taxes." This tender was refused. The amounts so tendered were sufficient to cover all dividends declared and paid by the bank and by the corporation during the period that the respective plaintiffs held the shares. There are other findings relating to certain rights.

In the trust company case the certificate tendered was a "duplex" certificate which had been accepted by the trust company in October, 1930, upon surrender of the Bankers Trust Company receipts originally received by it representing the same number of shares of stock of the bank and of the corporation. In the case of Mary B. Brandegee the "duplex" certificates tendered were those originally received by her.

The findings relating to changes in the securities between the times of the sales thereof and the times of the tenders are these: "Prior to the transactions in issue the capital stocks respectively of the Bank and the Corporation had been increased from time to time until there were outstanding 5,250,000 shares each of the Bank and of the Corporation. The Bank's shares were of a par value of $20 each. Subsequent to the transactions here in issue at a meeting on

December 12, 1932 the shares of the Corporation were changed from no par to $5 par. The number of said shares were . . . increased to 7,400,000 each of the Bank and the Corporation. [This increase of stock apparently took place in connection with a merger of two trust companies with the bank in April, 1930.] On March 15, 1934 an issue of 2,500,000 shares of five percent preferred stock of a par value of $20 each 'not accompanied by or transferable with shares of the Corporation' was authorized by the Bank and thereafter issued, and the par value of its common shares was reduced to $13.55 each. At or about the same date the capital value of the Corporation's shares was reduced from $5 to $1 a share." "On June 14, 1934, because of . . . provisions of the Federal Banking Act of 1933 . . . the agreement of March 21, 1917 was duly terminated. Thereupon stockholders of the 'unit' or 'duplex' certificates received separate certificates in the usual form for the shares owned by them respectively in the Bank and in the Corporation and were free to transfer one without the other." In May, 1933, the name of the corporation was changed to Chase Corporation, and its charter amended by adding a clause which in substance limited its powers to those of a holding company. "On or about June 15, 1934 the name of the Corporation was changed to 'Amerex Holding Corporation,' the number of its shares reduced from 7,400,000 to 740,000 and the par value thereof increased from $1 to $10 a share."

The plaintiffs participated in these changes to this extent: The trust company voted by proxy at the annual meetings of the bank and the corporation in January, 1930. This proxy "contained also a power of attorney and consent authorizing persons therein named to act for the . . . [trust company] in approving and consenting to amendments of the 1917 agreement. This power of attorney and consent was exercised by the persons named therein in the name and on behalf of the . . . [trust company] in connection with the amendment of January, 1930, to the said 1917 agreement." The trust company also voted by proxy at special meetings held in April, 1930, "relative to the

merger of two trust companies with the Bank and certain increases in the capital of the Corporation." And "a proxy for the annual meetings of the Bank and of the Corporation in January, 1934, signed in behalf of the Lowell Trust by the liquidating agent for the Commissioner of Banks in possession of the Lowell Trust" was voted at these meetings. Mary B. Brandegee voted affirmatively by proxy at the special meeting of the bank in 1934 upon the issue of preferred stock and the reduction of the par value of the common stock of the bank. Both the trust company and the plaintiff Brandegee also voted by proxy at the annual meetings of the bank and of the corporation held in January, 1931. Both of them received dividends while holding the shares.

The judge also found expressly in the case of Mary B. Brandegee that "the plaintiff acted with reasonable diligence after learning of the illegality of the transaction" and by reference incorporated such a finding in the findings in the case of the trust company. The defendant makes no contention with reference to this finding apart from the contentions already stated.

1. The defendant's contention that the plaintiffs cannot maintain these actions for the reason that they have "ratified and confirmed their purchases so they cannot now rescind them" cannot be sustained.

The principle was laid down in *Cummings* v. *Hotchkin Co.* 292 Mass. 78, 81, in the case of a sale in violation of the sale of securities act, that if "after acquiring full information" of facts showing a violation of the statute the purchaser "had chosen to continue to hold the stock and to participate as a shareholder in the affairs of the corporation, he would have obtained a sufficient title." This result follows from the fact that in such circumstances the court "refuses its aid to undo what the parties have already done." *Myers* v. *Meinrath*, 101 Mass. 366, 368. Accordingly, a purchaser may be precluded by his conduct from repudiating an illegal transaction and maintaining an action to recover the consideration paid.

Whether or not, in view of the illegal nature of the trans-

action, the conduct of a purchaser which precludes recovery is to be described as "ratification" or is more properly described as "waiver" or by some other designation, similar principles apply. The burden of proof is on the party relying on such "ratification." See *Murray* v. *C. N. Nelson Lumber Co.* 143 Mass. 250, 251; *Brown* v. *Henry*, 172 Mass. 559, 568; *Nashua River Paper Co.* v. *Lindsay*, 242 Mass. 206, 208. The judge made these findings: In the Lowell Trust Company case, "At sometime as early as the spring of 1933 the Commissioner of Banks' general counsel learned from some source that a question had arisen as to whether or not the stock of the Corporation had been 'qualified' under the Sale of Securities Act. The matter, however, seems not to have become a matter for serious inquiry until sometime in the late spring or early summer of 1934. Such an inquiry was then made in behalf of the Lowell Trust and other banks in possession of the Commissioner, having stock of the Corporation." In the Mary B. Brandegee case, "At sometime early in the summer of 1934 the plaintiff had called to her attention that 'no notice of intention to offer for sale' stock of the Corporation appeared to have been filed with the Department of Public Utilities, and that her purchase might be rescinded and the consideration recovered." Tenders were made on or about August 1, 1934. Neither these findings nor any evidence shows that any of the acts of the plaintiffs relied upon by the defendant to preclude recovery — apart at least from the appropriation of certain dividends — were performed after the plaintiffs had actual knowledge of material facts showing violations of the sale of securities act.

The defendant relies on the appropriation by the plaintiffs of dividends of the bank of August 1, 1934, February 1, 1935, and August 1, 1935. The dividend of August 1, 1934, must have been received, if at all, at about the time of the tender. There is nothing in the record to show that the amount of such dividend in the case of the trust company was not included in the tender. The record, with reference to this dividend in the case of Mary B. Brandegee, is somewhat confused. The judge found "the $2,886 tendered to

have been sufficient to cover all dividends declared and paid by the Bank and the Corporation during the period that the plaintiff had held the shares." But he ruled that "a dividend of $47 paid her as of August 1, 1934, does not in my opinion vitiate the tender," stating that "It was not clear whether the dividend was received before or after the tender." There is no evidence of any such dividend. The defendant, in its brief, suggests that the dividend referred to was a dividend of $141 — being $47 for each one hundred shares — basing its suggestion on an exhibit in the case which shows the receipt by the plaintiff of such dividend. But this exhibit also shows that this amount was included in the total amount of $2,886. In neither case could a finding have been made of "ratification" of the sale by the appropriation of this dividend before the tender, or of abandonment of the right to repudiate the sale by appropriation of such dividend after the tender. See *Brennan* v. *National Equitable Investment Co. Inc.* 247 N. Y. 486, 489–490. The 1935 dividends, if received by the plaintiffs, were received after these actions were brought, and the facts with respect to them are not shown. References to such dividends appear in the record only in connection with motions* to reopen the cases which were denied. And the denial of these motions was not error. Consequently these dividends are to be disregarded.

---

* The record respecting these motions contained the following: The decision and statement of findings by the trial judge was filed on July 19, 1935. On October 16, 1935, the defendant moved in both cases to reopen the cases for the purpose of showing that both plaintiffs had received dividend checks dated February 1, 1935, and August 1, 1935, sent to them as shareholders of the Chase National Bank. When these motions were presented the defendant exhibited the checks and the plaintiffs' counsel read a letter to the defendant's counsel dated August 2, 1935, to which no reply was made. The letter contained the following: "Dividend checks have been sent to my respective clients by the Chase National Bank. You are hereby notified that I have instructed my clients that they may retain these checks without prejudice to their respective rights in the pending litigation and hold them as bailees for the defendant in accordance with Judge Weed's decision, without in any manner waiving, ratifying or confirming the sales in question. If, however, you would rather have the checks returned to you or if you are now willing to accept the tender and return the money, will you be good enough to advise me to this effect." The motions were denied on October 17, 1935, the defendant saving an exception. The reference to the matter in the defendant's brief was in the following language: "The defendant's motions to reopen the cases for the purpose of showing the collection of substantial

The defendant contends, however, that there may be "ratification" without actual knowledge on the part of the purchaser of facts showing violation of the statute, and that there was error in the manner in which the judge dealt with this subject. He ruled in each case, at the request of the plaintiff, that there could be no ratification or confirmation of the sale in question "unless and until the plaintiff had knowledge of the facts upon which he now bases his right to rescind" or "by any act of the purchaser done without knowledge of those facts which render the sale void." The defendant argues that these rulings were too much restricted, and that there might be "ratification" not only on the basis of actual knowledge of facts showing violation of the statute, but also on the basis of knowledge of circumstances sufficient to put the purchaser on inquiry whether there had been such a violation. However, in the view most favorable to the defendant the plaintiffs were bound only by facts which they actually knew or ought to have known. See *Hall* v. *Paine,* 224 Mass. 62, 76. Compare *Kidder* v. *Greenman,* 283 Mass. 601, 615. Until reason to the contrary appeared the plaintiffs were entitled to assume that the defendant was not violating the law. *Kneeland* v. *Emerton,* 280 Mass. 371, 383. They had no primary duty to use diligence to discover a possible violation of the statute. See *Higgins* v. *Crouse,* 147 N. Y. 411, 420. Compare *Murray* v. *C. N. Nelson Lumber Co.* 143 Mass. 250, 251. At most they were chargeable with knowledge of facts — beyond their actual knowledge — only so far as there were circumstances known to them which imposed on them some further duty of inquiry. See *Hall* v. *Paine,* 224 Mass. 62, 76.

In the case of Mary B. Brandegee there was no evidence of any such circumstance known to the plaintiff before the

---

dividends in 1935 after the trial by both plaintiffs without statement or explanation was denied by the trial justice. The checks were produced at this hearing and the motion denied after a letter from plaintiffs' counsel, which did not deal with these dividend checks, had been read. These 1935 dividends were collected by the plaintiffs. Such acceptance of benefits along with the other facts herein set out is a binding election by the plaintiffs to stand on their purchases, and constitutes an affirmance of such purchases."— REPORTER.

spring or summer of 1934 and no evidence that, thereafter, she participated in the changes in the securities relied on by the defendant or appropriated to herself any dividends thereon. And the case of the Lowell Trust Company is not different unless by reason of testimony that one of the many lawyers who came to the office of the commissioner of banks mentioned to the general counsel for the commissioner a decision of some supreme court adverse to the defendant corporation "on a situation like this." There was, however, no evidence that a decision of this court was referred to or that there was any such decision. And the likelihood was remote that there had been such a decision by any other supreme court relating to violation of the sale of securities act of this Commonwealth. This indefinite information could not rightly have been found to amount to such knowledge of circumstances as imposed on the general counsel or the commissioner a duty of further inquiry.

In this state of the evidence the rulings given by the judge, as above set forth, were not prejudicial to the defendant and there was no error in ruling, as the judge did in each case at the request of the plaintiff, that "As matter of law there is no evidence in this case to warrant a finding of ratification of the sale[s] in question."

2. The defendant's contention that the plaintiffs cannot maintain their actions for the reason that the defendant "cannot be restored to *status quo*" because of changes in the securities cannot be sustained.

This contention is based on the principles applicable generally to the maintenance of actions at law based upon rescission. In *O'Shea* v. *Vaughn*, 201 Mass. 412, 422–426 — a case based on rescission for fraud — the court said: "Two general cardinal rules are laid down as to the exercise of the right to rescind, of which the first is that the plaintiff must return all that he received under the void contract, and the second is that both parties must be put *in statu quo*, or, as it is frequently phrased, must be restored to their former position," and pointed out that these rules were subject to qualifications and exceptions. The court said further that

"In many, if not most, of the cases where it is stated that the parties must both be placed *in statu quo*, the trouble has been that the defrauded party has not restored fully what he received, and hence the other party was not placed *in statu quo.*" *Cummings* v. *Hotchkin Co.* 292 Mass. 78, 82, arising under the sale of securities act, where it was said that the tender "did not put the parties *in statu quo*," was such a case. In that case there was no tender which, if accepted, would have restored to the seller "the securities themselves" within the principle stated in *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156, 159.

Nothing which appears in the present cases required the plaintiffs to do anything to restore the defendant to *status quo* other than to make full return of that which they had received, including the profits derived therefrom. Compare *O'Shea* v. *Vaughn*, 201 Mass. 412, 423; *McGrath* v. *C. T. Sherer Co.* 291 Mass. 35, 41.

The evidence in the present cases — apart, at least, from the matter of rights later considered — warranted findings that the plaintiffs, if the tenders were accepted, would retain no benefits derived from the transactions. However, the rules applied in an action at law based upon a previous rescission of a sale of property — as, for example, for fraud or breach of warranty or other breach of contract — ordinarily require a return or tender of the identical property received, though in the case of corporate stock a return or tender of equivalent shares is sufficient. *Birch* v. *Arnold & Sears, Inc.* 288 Mass. 125, 133. And they ordinarily require that the property sold be returned or tendered to the seller in the same, or substantially the same, condition as when received by the purchaser, unless changes therein have resulted from the wrong or default of the seller. See *O'Shea* v. *Vaughn*, 201 Mass. 412, 422–424; G. L. (Ter. Ed.) c. 106, § 58, (1) (d), (3); Am. Law Inst. Restatement: Contracts, §§ 349, 400, 480. But, even where this principle is applied strictly, mere depreciation in market value will not prevent rescission. See *Snow* v. *Alley*, 144 Mass. 546, 551, 555; *Rackemann* v. *Riverbank Improvement Co.* 167 Mass. 1, 5; Am. Law Inst. Restatement: Contracts, § 349, Comment b.

In the case of Mary B. Brandegee it is undisputed that the "duplex" certificates tendered were the identical certificates received by her from the defendant. They were in form, at least, "the securities themselves" received by her. The defendant, however, relies on changes in the substance of the securities rather than in the form thereof. It relies particularly on (a) the change in the capitalization of the bank resulting from the issue of preferred stock for which this plaintiff voted, (b) the change in the corporate purposes of the corporation, and (c) the removal of the restriction upon separate sale of the two kinds of stock. The judge found that "The shares tendered . . . were the same that she had received. She was not responsible for the changes that had occurred. The fact that her shares had been voted by her proxy as already described, and particularly for the issue of preferred stock by the Bank, did not amount to a ratification and confirmation of the sale, or work as an estoppel to her right to rescind. So far as the tender is concerned, I find this to have been sufficient." The judge dealt properly with the plaintiffs' participation in the changes as relating to "ratification and confirmation" or "estoppel." This matter, so far as argued by the defendant, has already been considered.

The findings of the judge mean that there is no such change in the shares as vitiated the tender. This conclusion was not erroneous as matter of law. Clearly it could have been found not only that the certificates tendered by this plaintiff were the identical certificates received by her, but also that when tendered they represented stock of the same corporations as when received by the plaintiff. *Western Bank of Scotland* v. *Addie*, L. R. 1 H. L. (Sc.) 145, relied on by the defendant, is distinguishable in this respect. See also *White* v. *New Bedford Cotton Waste Corp.* 178 Mass. 20; *Beverly* v. *Richards*, 255 Mich. 508; *Mertz* v. *Guaranty Trust Co. of New York*, 247 N. Y. 137, 141. Compare *Ginn* v. *Almy*, 212 Mass. 486, 507. It could be found that the changes which occurred between the time of the sale and the time of the tender did not affect the identity of the shares — that the shares tendered were the shares

received by the plaintiff. The question remains whether as matter of law the tender was insufficient on the ground that the shares when tendered were not in the same, or substantially the same, condition as when received.

In passing upon the sufficiency of the tender the nature of the action must be taken into account. The plaintiff's sole remedy is to recover the consideration paid on the basis of a repudiation of the sale. In an ordinary case of rescission there is an alternative remedy by an action for damages based on affirmation of the contract. See *Roche* v. *Gryzmish,* 277 Mass. 575, 579. The existence of this alternative remedy is one ground, at least, for a strict application of the rules governing tender. See *Snow* v. *Alley,* 144 Mass. 546, 558. An innocent purchaser of securities sold in violation of the sale of securities act has no such alternative remedy. Such a purchaser is permitted to recover the consideration paid by him, notwithstanding the fact that the transaction is fully executed, for the reason that, if such relief were denied, the statute, as stated in *Kneeland* v. *Emerton,* 280 Mass. 371, 379, "would signally fail of its beneficent object," or, as expressed in *Goodwin* v. *Simpson,* 292 Mass. 148, 155, "the full and complete protection which the statute was intended to afford buyers" would not be given. On the other hand, as was said in *Cummings* v. *Hotchkin Co.* 292 Mass. 78, 81, "Every consideration of equity and fair dealing requires the plaintiff to return the stock and the profits realized on it to the defendant before seeking to recover from the defendant the price paid for the stock. The technical differences between void and voidable contracts do not prevent the result required by conscience and justice." The tender, therefore, must be such as will satisfy the requirements of "equity and fair dealing" without denying to the purchaser the protection which the statute was intended to afford. The rules ordinarily governing tender are to be applied in the light of these considerations. We think that, in the light of these considerations, it could be found that the tender was sufficient.

These changes do not relate merely to the individual shares bought by the plaintiff; they relate to all such shares.

They resulted from action of the bank or corporation or the stockholders in the course of the operation of the bank or corporation or the operation under the deposit agreement. They could be made without the consent of the owner of any particular shares. The plaintiff did not participate in such changes except as she acted as a stockholder without knowledge of the defendant's wrongdoing. The possibility of such changes was inherent in the shares at the time of the sale to the plaintiff and must be regarded as having been within the contemplation of the parties at that time. The changes actually effected, though important, may fairly be described as incidents of the shares rather than changes in the character of them. See *Mayo* v. *Knowlton*, 134 N. Y. 250, 254. These changes somewhat resemble depreciation in the value of shares which, according to the strictest rule, is not such a change in the character of the shares as prevents rescission.

A tender of the shares, after the changes occurred, with the profits derived therefrom would return to the defendant all the benefits received by the plaintiff including the identical shares purchased. And it would put the defendant in substantially the same position as if it had not sold the shares but had retained them until the time of the tender. In these circumstances it could have been found that the tender was sufficient to meet the requirements of "equity and fair dealing." The plaintiff has done all that she could toward restoring the original conditions. See *Sim* v. *Edenborn*, 242 U. S. 131, 136. The tender is not to be held insufficient on the ground that changes which were incidents of the shares did not result from any independent wrong or default on the part of the defendant. To apply a stricter rule would deny to purchasers the protection which the sale of securities act was intended to afford them.

The defendant relies particularly on *Huglin* v. *H. M. Byllesby & Co.* 72 Fed. (2d) 341, and *Vogler* v. *Gustin*, 257 Mich. 475. There are material differences between the former case and the case at bar. So far as these cases are inconsistent with our conclusion we cannot follow them. Moreover, it may be, as the defendant contends, that a con-

tract for a sale of the shares made before the changes took place would not be performed by delivery of the shares after such changes occurred. But this would be by reason of the implication that the parties to such a contract intended that the shares should be delivered in their condition at the time of the contract. See *Merchants-Citizens National Bank* v. *Mauser*, 297 Penn. St. 399, 404. See also *Mertz* v. *Guaranty Trust Co. of New York*, 247 N. Y. 137. There is no such implied intention in the present case and the analogy fails.

In the case of the trust company the finding was warranted that the "duplex" certificate tendered was received by the trust company in substitution for Bankers Trust Company receipts received by it from the defendant, and that this certificate, when received, represented the same number of shares of stock of the bank and of the corporation as the Bankers Trust Company receipts for which it was substituted, subject to the same restrictions upon separate transfer of either stock. It could have been found that this substitution was an ordinary incident of the security and made no such material alteration therein, so far as its form is concerned, as to destroy its identity and thereby vitiate the tender. Indeed, the defendant apparently now makes no contention to the contrary. The defendant, however, in this case, as in the case of Mary B. Brandegee, relies on changes in substance. These changes include the changes relied on in the other case, and the defendant's contention with respect thereto fails for the reasons stated. But the defendant relies also on changes made before the sale to Mary B. Brandegee in the capitalization of the bank and of the corporation in connection with the consolidation of the bank with certain trust companies. The principles already stated apply to these changes. Necessarily the consolidation was "under the charter" of the bank. Act of February 25, 1927, c. 191, § 1, 44 U. S. Sts. at Large, Part 2, 1224, 1225. See U. S. C. Title 12, § 34a. The corporate identity of the bank continued unaffected by anything in connection with the consolidation. *Worcester County National Bank, petitioner*, 263 Mass. 394, 399, *S. C.* 279 U. S. 347, 360. The stockholders of the bank continued to be stockholders

without further action on their part.  *Hiatt* v. *Peddy*, 73 Fed. (2d) 235.  And we think that the fact that dissenting stockholders might have had their shares appraised and the value thereof paid to them does not take the case out of the principles stated.

3. The defendant's contention that the plaintiffs cannot prevail for the reason that the tenders were insufficient cannot be sustained.

The trial judge found that the tenders were sufficient. The sole contention of the defendant to the contrary — apart from the contention relating to changes in the securities — is based on the ground that the tenders "did not include benefits flowing from rights issued to the plaintiffs as stockholders of the defendant corporation to purchase stock of the First Boston Corporation."  The judge found in the trust company case that the amount tendered included the "sum of $5 realized from the sale of certain rights to subscribe that had accrued to it," and in the case of Mary B. Brandegee that while she held the shares "she had received a . . . sum of $12 realized from the sale of certain rights that had accrued to her as such shareholder," and that the tender "did not include the $12 received by her from sale of rights."  The judge found further in each case that the defendant's treasurer "did not verify the dividends paid or rights accrued . . . before refusing the tender."  The evidence which supports these findings relates to rights to subscribe for stock of the First Boston Corporation issued to stockholders of the defendant corporation in May, 1934, in the course of a transaction by which assets of the latter corporation were transferred to the former.

There was no error of law.

These rights, being rights to subscribe for shares of stock of a corporation other than the defendant corporation, were received by the plaintiffs as dividends.  Such dividends, like cash dividends, were separate from the shares of stock of the corporation paying them and did not affect the character of the shares on which they were paid so as to preclude the return or tender of such shares as "the securities themselves" (see *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156,

159), even if the dividends reduced the value of the shares upon which they were paid. See *Gray* v. *Hemenway*, 223 Mass. 293, 295; *Boston Safe Deposit & Trust Co.* v. *Commissioner of Corporations & Taxation*, 273 Mass. 187, 196–197. See also *Snow* v. *Alley*, 144 Mass. 546, 551–555; *Rackemann* v. *Riverbank Improvement Co.* 167 Mass. 1, 5; *Neblett* v. *Macfarland*, 92 U. S. 101, 104; Am. Law Inst. Restatement: Contracts, § 349, Comment b. These rights were not parts of the shares originally purchased, but were benefits derived from the use and possession of such shares.

The present question relates, therefore, not to the requirement of tender of "the securities themselves," but rather to the requirement of tender of benefits derived therefrom after the original transaction, the "dividends or interest which the purchaser has received" from the shares. See *Grueby* v. *Chase Harris Forbes Corp.* 292 Mass. 156, 159. The plaintiffs could have availed themselves of the benefits of the rights either by using them in subscribing for stock of the corporation to which they related, or, since they were transferable, by selling them. The plaintiffs, however, were not required, as contended by the defendant, to exercise these rights by subscribing for stock and to tender to the defendant the shares so acquired or a like number of shares of such stock acquired in some other way. See *Neblett* v. *Macfarland*, 92 U. S. 101, 104. It could have been found that a sale of these rights was a natural incident of the possession and use of the shares of stock of the defendant corporation, and that the proceeds of such a sale fairly represented the benefits derived from the shares by reason of the distribution of the rights. In the circumstances here shown a return of such proceeds would be sufficient on a bill in equity for rescission. See *Putnam* v. *Bolster*, 216 Mass. 367, 372. And even in an action at law the requirement of a return or tender *in specie* is not to be applied with the same strictness to benefits received as incidental to the ordinary and proper use of the property as to the property itself. See Am. Law Inst. Restatement: Contracts, § 349, Comment b. The finding, therefore, was warranted that the tender in the Lowell

Trust Company case which included the amount received by it from the sale of rights was sufficient. And even in the case of Mary B. Brandegee any technical insufficiency of the tender, as a condition precedent to the maintenance of the action, by reason of the slight error in the amount thereof due to the failure to include therein the sum of $12 received as the proceeds of the sale of rights, could have been found to have been waived by nonobjection. See Williston on Contracts (Rev. Ed.), § 743; *Swanke v. Herdeman*, 138 Wis. 654, 659; Cases cited 62 C. J. pp. 663, 664. Compare *Minsky v. Zieve*, 255 Mass. 542, 545.

Fourth. We have considered the questions of law presented by the defendant's exceptions and argued by the defendant. The requests for rulings granted and refused need not be discussed in further detail. No error is disclosed. Since the defendant's exceptions must be overruled the plaintiffs' exceptions are waived. The entry in each case must be

> *Defendant's exceptions overruled.*
> *Plaintiff's exceptions waived.*