BENSONS PLAZA, Appellant, v GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., et al., Respondents.

Fourth Department, December 17, 1976

*Borins, Halpern, Snitzer, Levy, Fradin & Loonsk (Harold Halpern* of counsel), for appellant.

*Magavern, Magavern, Lowe & Beilewech (Michael Beilewech, Jr.,* of counsel), for Great Atlantic & Pacific Tea Company, Inc., respondent.

CARDAMONE, J. This appeal involves the construction of a tax escalation clause contained in a lease of real property. The original lease dated January 11, 1955 was drawn on a form printed by the respondent A & P Company. It provided that the owner would construct a store with an adjacent parking lot on land which it owned in Tonawanda, N. Y. in accordance with plans and specifications to be approved by A & P. The printed portion of the lease provided in paragraph 13 that "the lessor will pay any and all taxes assessed or imposed upon the said demised premises." Immediately following this printed clause the following words were typed in: "except such taxes as may be assessed or levied against the property by reason of the lessee's use and occupancy." The lease also provided that A & P, as lessee, undertook to pay all water, gas, electricity, lighting, snow removal and heating charges for the building it occupied. Thus, it was made clear that the arrangement between the owner and A & P was for the owner

to construct on its own land a building and parking lot; all of the expenses occasioned by the use and occupancy of the premises, however, were to be paid by A & P.

The tax escalation clause in question was executed on January 14, 1966. It provided for a term of 8 years and 11 months at a monthly rental of $1,627.50 and granted A & P an option for three five-year renewals at a monthly rental of $1,677.50, "subject to all other terms and conditions expressed in the said lease." The tax escalation clause which is the crux of this lawsuit was typed into the printed A & P renewal form and reads as follows: "In the event the real estate taxes upon the demised premises for any year falling in whole or in part within the term or renewal options hereby demised shall vary upward in excess of Five Per Cent (5%) of the amount of taxes levied for the full tax year 1965, then the monthly rental herein reserved for any month falling within such tax year shall be increased by one-twelfth of the amount of such excess; provided, however, that in no event shall the rental fixed under this clause vary from the rental under this lease by more than $1006.50 per year. Any adjustment in rental required by this clause shall be made annually within 60 days after the close of the tax year." The clause further provided that the owner would properly exhibit to the lessee his receipted tax bills, revised assessments, official notices, etc., regarding taxes and that the lessee, at its option, could protest any such increase in real estate taxes. The taxes for the year 1965 were $5,530. They have risen steadily each year and in 1974 amounted to $9,336.

The dissenters conclude that the base rent as fixed in the lease ($1,627.50 per month and later $1,677.50 per month) comprises the first component of the total rental due and that the second component is made up of the rental increment as fixed by the tax escalation clause. The dissent agrees with the argument made by A & P that the rental fixed in the lease may never be increased as a result of the escalation of taxes by more than $1,006.50. They rely on the language contained in the tax escalation clause "that in no event shall the rental fixed under this clause vary from the rental under this lease by more than $1006.50 per year." They conclude that "under no interpretation" can the rent be construed to be a combination of the lease rent and the tax increment to be carried forward to each succeeding year. Stated in another way it is the dissent's view that the monthly lease rental of $1,677.50 is

fixed and that the total monthly rental due under the lease will never under any circumstances exceed $1,677.50 plus $83.88 (i.e., one-twelfth of $1,006.50).

Considering the circumstances surrounding its execution, it is clear that this lease had an intent quite different from that given it by the dissent. Plainly the clause in question is what is commonly known as a "stop-tax clause." Its purpose is to shift to the tenant the burden of increases in taxes over those which obtained at the time the lease was executed so as to stabilize this expense item of an owner-landlord. The fixing of an upper limit of $1,006.50 is inserted to avoid a precipitious rise in the year-to-year rent which the tenant must pay and thus stabilize its rental obligation. As noted, it was the intent of the parties, as revealed from all of the other provisions in the lease, that the A & P, as lessee, would pay all of the expenses including taxes, occasioned by its use and occupancy of the premises. We conclude, therefore, that a proper reading of the tax escalation clause is that the additional taxes required to be paid by the tenant are *cumulative* and added to the base. The tenant must pay additional rent thereafter to reimburse the landlord for the increase in taxes (hence the name "stop-tax" clause). The $1,006.50 is an annual limitation set so that, in any given year, the rental obligation will not exceed the preceding year's rental by more than the sum of $1,006.50.

The tax year 1965 is the *initial* base. It is not a fixed and unchanging figure, however, but, rather, a fluid figure which moves the rental base of the lease upwards as provided in the tax escalation clause. Taxes paid in previous years are carried forward as rent in ensuing years. Such a conclusion may properly be drawn from the language in the tax escalation clause which states that "then the *monthly rental* herein reserved for any month falling within such tax year *shall be increased* by one-twelfth of the amount of such excess" (emphasis supplied). Lending further support to this construction are the words "per year" following the limiting amount of $1,006.50, which words would be unnecessary were the total increment ever permitted under this lease to be limited to $1,006.50 over the year 1965. Recognizing that the rental fixed by the lease will be adjusted by tax increases, the parties provided in the tax clause that "any *adjustment* in *rental* required by this clause shall be made annually within 60 days after the close of the tax year" (emphasis supplied). The trend

of real property taxes, which have nearly doubled from 1965, admits the real probability that by the year 1990, when the lease expires, the landlord will be receiving less rent (about $21,000) than it is paying in taxes. Such is the absurd result which would be reached by the dissent under its interpretation of this lease.

At the very least the tax escalation clause should be considered ambiguous and the lease considered as a whole, the purpose of "stop-tax" clauses and the economic ramifications on appellant owner suggest the meaning adopted by us. We are cognizant of the well-established rule that the court should not attempt, under the guise of interpretation, to make a new contract for the parties different from that expressed in the words they used (Encyclopedia NY Law, Contracts, by Simpson and Duesenberg, § 826; *Rodolitz v Neptune Paper Prods.*, 22 NY2d 383, 386). Where language is susceptible of two meanings, however, a construction should be adopted which is rational, commercially reasonable and does not reach an absurd result *(River View Assoc. v Sheraton Corp. of Amer.*, 33 AD2d 187, affd 27 NY2d 718; *New York Cent. R. R. Co. v New York, New Haven & Hartford R. R. Co.*, 24 Misc 2d 414, mod 13 AD2d 309, affd 11 NY2d 1077; see *Ocean-Town Realty Corp. v Great Atlantic & Pacific Tea Co.*, 54 Misc 2d 502). The lease should receive an interpretation which will best effectuate the intention of the parties. *(Sattler v Hallock,* 160 NY 291.) Where such intention is not readily ascertainable from the particular words used in the tax escalation clause, it must be inferred from a reading of the entire lease *(Genet v Delaware & Hudson Canal Co.*, 163 NY 173, 179; *Atwater & Co. v Panama R. R. Co.*, 246 NY 519, 524; Simpson, Contracts [2d ed], § 102, p 210; Simpson and Dusenberg, Contracts Law, § 813, p 484).

Under the circumstances present here where there is no explicit reference to a base year figure that is to be considered static, it is reasonable to construe the lease as calling for changing rental determined by increases in taxes. This interpretation is properly derived from the language used in the tax escalation clause (see, Leases—Tax Escalation Clause, Ann 48 ALR3d 287, 309). It does not constitute a remaking of the lease, but is fair and equitable particularly in view of the fact that the contested clause was prepared by A & P on its own printed form. This results, of course, in our construing the words of doubtful meaning, if any, most strongly against the

party who used them (Simpson, *supra,* § 102, p 212; Simpson and Dusenberg, *supra* § 822; 4 Willison, Contracts [3d ed] § 621; 3 Corbin, Contracts, § 559; 10 NY Jur, Contracts, § 223; *Rentways, Inc. v O'Neill Milk & Cream Co.,* 308 NY 342, 348).

Finally, we cannot accept the construction of the clause in question adopted by the dissent because in our view "[I]n the context of the arrangement and lease between the parties, such interpretation would achieve an absurd result" *(Westbury Post Ave. Assoc. v Great Atlantic & Pacific Tea Co.,* 46 AD2d 860, affd 38 NY2d 890, 891).

The order at Special Term which granted respondent A & P's cross motion for summary judgment should be reversed and the motion denied. Appellant Bensons Plaza's motion for summary judgment on its first cause of action should be granted.

MOULE, J. (dissenting). I dissent and vote to affirm the order granting summary judgment in the tenant's favor. The majority has engaged in a useless and general discussion of "stop-tax" clauses and speculated on possibilities of economic hardship to the landlord which have no basis in the record. There is no need to respond to such as it is in no way dispositive of the issue here. We are concerned solely with whether the language of the lease renewal agreement with respect to the escalation clause is unambiguous or not. I do not see how it could be more specific or clearer.

The record indicates that defendant tenant entered into the original lease on the premises with plaintiff's assignor on January 11, 1955. That lease provided *inter alia* for an initial term of seven and one-half years at a monthly rental of $1,722.50 and at the tenant's option for a subsequent seven and one-half year renewal at a monthly rental of $1,522.50. In addition, the lease agreement specified that the "Lessor will pay any and all taxes assessed or imposed upon the said demised property except such taxes as may be assessed or levied against the property by reason of the Lessee's use and occupancy." There is no indication in the record, however, that any taxes relating to the tenant's use and occupancy were ever imposed during either the initial or renewal term of this lease.

Thereafter on January 14, 1965, before the expiration of the renewal term of the original lease and at a time when plaintiff's assignor was receiving under the terms of that lease rent

of \$1,522.50 per month, defendant and plaintiff's assignor entered into a new lease renewal agreement which superseded the terms of the original agreement. This new agreement provided for an initial renewal term of 8 years and 11 months at the increased rental of \$1,627.50 per month and for three optional five-year renewal terms at a monthly rental of \$1,677.50. Furthermore, it contained the tax escalation clause upon which this action is based.

As noted by the majority that clause provides that in the event the real estate taxes on the demised premises "vary upward in excess of Five Per Cent (5%) of the amount of taxes levied for the full tax year 1965, then the monthly rental herein reserved for any month falling within such tax year shall be increased by one-twelfth of the. amount of such excess." The clause, however, goes on to provide "that in no event shall the *rental fixed under this clause* vary from the *rental under this lease* by more than \$1,006.50 per year." (Emphasis supplied.)

The majority's interpretation of this clause to the effect that the tenant is bound to pay any increase attributable to taxes over the previous year's combined base rental and tax increment, to the extent of \$1,006.50, is in my opinion totally unsupported by the clear language used by the parties.

The tax escalation clause when read in its entirety indicates that the total rent required to be paid by the tenant is essentially made up of two separate rental components, viz., the base monthly rental as provided by the preceding terms of the lease renewal and the increment attributable to taxes. There can be no doubt that the term "rental fixed under this clause" clearly refers to combined base rental and one twelfth of the tenant's total liability for tax increases. Similarly, the term "rental under this lease" can only refer to that rental which is provided by the express terms of the lease, i.e., \$1,627.50 per month during the initial renewal term and \$1,677.50 per month during the optional renewal term. An integrated reading of the clause leads to the inevitable conclusion that the tenant is only liable to pay the increases due to taxes to the extent such increases do not exceed \$1,006.50 over the base rental for the property. Thus in any given year the base rental is determined without reference to any preceding year's increment due to taxes. Accordingly, in no event may the tenant's obligation in any one year exceed the base rental

(either $1,627.50 or $1,677.50 per month plus $83.88 (i.e., one twelfth of $1,006.50).

The majority attempts to justify its conclusion upon several different grounds including the general purpose of such "stop-tax" clauses, the possible economic ramifications upon the plaintiff in the event it is unsuccessful in this suit and the intent of the parties with respect to tax increases as evidenced by the terms of the original 1955 lease agreement. However, as the majority has recognized, it "is well settled that a court may not, under the guise of interpretation, make a new contract for the parties or change the words of a written contract so as to make it express the real intention of the parties if to do so would contradict the clearly expressed language of the contract [citations omitted]." *(Rodolitz v Neptune Paper Prods.,* 22 NY2d 383, 386; see, also, *Laba v Carey,* 29 NY2d 302, 308; *West, Weir & Bartel v Carter Paint Co.,* 25 NY2d 535.) Thus, while one may assume that the parties intended to effect the general purposes of such a clause or that they did not intend the economic ramifications upon plaintiff envisioned by the majority, such considertions are, absent ambiguous language, irrelevant to our analysis and where, as here, the language is clear and unambiguous, the parties are bound by that language.

Nor can the majority, in my opinion, find support for their argument in the language of the original 1955 agreement which provided that the tenant would pay all expenses including taxes occasioned by its use and occupancy of the premises. In the first place, there is no indication in the record that the tax increments sought to be recovered by plaintiff or any part thereof were occasioned solely by virtue of the tenant's use and occupancy. On the other hand, in the event a portion of these taxes was due to the tenant's use and occupancy, plaintiff's assumption of at least the first 5% of such tax increase, pursuant to the terms of the escalation clause, effectively altered the afore-mentioned terms of the original agreement and to the extent that it has so altered it, its applicability to the instant situation is suspect.

The majority's reliance, in construing the terms of the escalation clause against the tenant's interest, upon the fact that the clause was prepared by the tenant on its own printed form is also misplaced. While admittedly the clause appeared on the tenant's form, it was typed in and was, therefore, not a part of the original printed lease renewal form. In addition,

the record offers no support for the conclusion that the clause was prepared solely by the tenant without reference to negotiations between the parties. In any event the rule of construction referred to by the majority only applies in situations of ambiguity and, since no ambiguity exists in the instant case, that rule is inapplicable.

MARSH, P. J., and GOLDMAN J., concur with CARDAMONE, J.; MOULE and SIMONS, JJ., dissent and vote to affirm the order, in an opinion by MOULE, J.

Order reversed, with costs and plaintiff's motion for summary judgment granted.