In re MEDICO ASSOCIATES,
INC., Debtor.

Frederick G. FISHER, Jr., James M.
Langan, Richard Maguire,
Receivers, Plaintiffs,

v.

J. Henry SMITH, Commissioner of the Department of Social Services of the City of New York and Phillip Toia, Commissioner of the Department of Social Services of the State of New York and Robert P. Whalen, M.D., Commissioner of the Department of Health of the State of New York and Peter C. Goldmark, Director of the Budget of the State of New York, Defendants.

Bankruptcy No. 76–1414–L.

United States Bankruptcy Court,
D. Massachusetts.

July 18, 1980.

Robert Somma, Goldstein & Manello, Boston, Mass., for plaintiffs-receivers.

Barry M. Portnoy, Sullivan & Worcester, Boston, Mass., for debtor and plaintiff-intervenor.

Bradley A. Sacks, Brooklyn, N.Y., for defendant City of New York.

Mark L. Silverstein, New York City, for defendant State of N.Y.

## MEMORANDUM AND ORDER

THOMAS W. LAWLESS, Bankruptcy Judge.

The Court has before it a motion for summary judgment filed by the plaintiffs on December 22, 1978. A hearing on the motion was held on May 23, 1979. The pleadings, legal memoranda, affidavits, and exhibits submitted by the parties are voluminous and total in excess of 5000 pages. However, despite the extensive submissions, the ultimate issues before the Court are simply stated and readily determined. The Court's findings of fact and conclusions of law are set forth below. In accordance with these findings and conclusions, the Court partially grants the plaintiffs' motion for summary judgment and sets down for trial several factual issues.

### PARTIES AND ISSUES

Plaintiffs are the receivers of MediCo Associates, Inc. ("MediCo"), a debtor in arrangement proceedings under Chapter XI of the Bankruptcy Act commenced on May 26, 1976. On November 19, 1976 the receivers brought suit against the City of New York and the State of New York through their authorized representatives. In this action the receivers seek a determination that, prior to MediCo's arrangement proceedings, a valid contract was made between New York City and MediCo under which health care services were to be rendered by MediCo and certain MediCo-affiliated nursing homes located in Connecticut (the "Connecticut Homes")[1] to patients eligible for assistance under the New York State Medicaid Program (New York Social Services Law, § 363 et seq.). The receivers also seek a determination that this contract requires that New York City pay for these services at a fixed price rate. Finally, the receivers ask the Court to enforce this so-called fixed price contract and order that payments thereunder be made or, where

---

1. These nursing homes include: Cedar Lane Nursing Home, Forestville Nursing Home, Whitewood Manor Nursing Home, Golden Hill Nursing Home, New Fairview Hall Convalescent Home, Brookhollow Health Care Center, Woodmere Nursing Home, Derby Convalescent Home, and New Lakeview Convalescent Home. Of these nine nursing homes only Derby and New Lakeview are not debtors with MediCo in these joint proceedings.

already made, be held to have been properly paid. The receivers contend that since there is no genuine issue as to any material fact regarding these matters and that they are entitled to judgment as a matter of law, their motion for summary judgment should be granted.

Defendants dispute the making of a contract and contend that, even if a contract were made, the contract did not include a fixed price payment provision; rather the defendants assert that the rate of payment was to be cost related and that the rate of payment initially established by the parties was subject to audit and retroactive adjustment. The defendants also argue that even if the Court finds the contract to be of a fixed rate type, federal and state law governing the Medicaid Program in New York prohibits such contracts and thus nevertheless renders the MediCo/New York contract unenforceable. In addition, the defendants allege that MediCo has failed to fully perform all of its obligations under the contract and thus is not entitled to any recovery thereunder. Moreover, apart from the above considerations, the defendants assert that several material factual issues exist which preclude granting the motion for summary judgment.

In summary, I perceive the following issues to be before the Court: (1) whether a fixed price contract was made between MediCo and New York City; (2) whether that contract, if made, is valid and enforceable in light of governing Federal and state Medicaid law; and (3) whether MediCo has performed under the contract and may recover thereunder.

## BACKGROUND

MediCo's arrangement proceedings have been jointly administered with Chapter XI and XII proceedings involving 42 related or affiliated individual, partnership and corporate debtors under the general caption *In re Bolton Hall Nursing Home, et al.* commenced on or after May 26, 1976 (the "Proceedings"). The plaintiffs were appointed as functionaries shortly after the commencement of the Proceedings to preside over this economically distressed network of nursing homes. To date, the reorganization effort has been successful, at least to the extent that quality health care services have been furnished without interruption to a nursing home population in three states. At the same time, the debt structure of the majority of the entities which own and operate the homes, including MediCo itself, has been adjusted in accordance with the consensual and judicially approved settlements embodied in the confirmed plans of arrangement. MediCo's plan of arrangement was confirmed on April 20, 1978. The Court, however, retained jurisdiction to resolve the within litigation.

Before and since its arrangement proceedings, MediCo has functioned as a management company in the health services field. Its principal business activity has been to provide centralized consulting, administrative and accounting services to nursing homes which it owns or operates in Massachusetts, Connecticut and New York (the "MediCo Homes"). Prior to and since the inception of the Proceedings, MediCo and the MediCo Homes have employed over 3,000 health care professionals and other medical and clerical personnel and provided health care services to a nursing home population of over 3,000 patients. Included in this nursing home population are patients transferred from New York City entitled to financial assistance for medical care under the New York Medicaid Program. These New York City patients were admitted into the Connecticut Homes under the terms of the contract which is the subject matter of this litigation.

How New York City and MediCo came to their mutually dissatisfying undertaking is comprehensively related in the parties' filings and particularly in the affidavits furnished by MediCo's principals and New York City's representatives. Suffice it to say that during 1972 and early 1973, New York City determined that it had a shortage of nursing home beds and health care capabilities for its Medicaid patients and therefore sought to make arrangements to have these patients admitted into out-of-state

nursing homes. MediCo and the Connecticut Homes were among those out-of-state providers of health care services to which New York City looked for placement of its Medicaid patients. Consequently, from at least mid-1973 forward, New York City and MediCo had a developed relationship in which MediCo and its Connecticut Homes provided health services to New York City Medicaid patients. For approximately three years New York City transferred patients to the Connecticut Homes and paid for the services provided at the rate agreed to by the parties.

On May 7, 1976, New York City sent a letter to MediCo announcing that effective June 1, 1976, it would discontinue paying part of the rate it had theretofore paid under what the City itself described as the "current contract" between itself and the Connecticut Homes. Consistent with its statement, the City reduced the previously unquestioned rate by $7.50 per patient per day. The City, however, did not assert that the quality of nursing home care furnished by MediCo and the Connecticut Homes was deficient. Nor did New York City suggest or attempt to remove any of its Medicaid patients from the Connecticut Homes. In fact, New York City continued to transfer additional patients and at the City's request the Connecticut Homes continued to accept such patients through August 1978. The major difference in the New York City/MediCo relationship after May 7, 1976, was simply, and crucially, that the City had decided not to pay part of the rate it had paid during the previous three years.

At the time New York City reduced the rate it was paying to the Connecticut Homes, MediCo was experiencing the economic and financial pressures that ultimately led to the May 26, 1976 bankruptcy filings. To some extent the City's announcement may well have accelerated MediCo's journey to the bankruptcy court. In any event, the unilateral rate reduction is the source of the present dispute.

The payment problem became that of the receivers with the commencement of the arrangement proceedings. While negotia-

tions between the parties ultimately proved unsuccessful, the parties were able to reach agreements on several matters relating to the conduct of the parties pending a resolution of the litigation. The parties agreed: (1) that after August 1978, New York City would not seek to transfer to the Connecticut Homes, and the Connecticut Homes would not admit, any additional New York City Medicaid patients; (2) that the New York City Medicaid patients residing in the Connecticut Homes as of August 1978, would remain there, and that payment for such services would be made by New York City at a rate comprised, in part, of a portion of the unilaterally reduced "contract" rate; and (3) that payments made by New York City and accepted by the receivers and/or MediCo and the Connecticut Homes for services rendered to New York City Medicaid patients during the Proceedings and the pendency of this litigation would not (a) constitute a waiver by either party of its respective claims regarding the contract and its payment provision or (b) establish the actual value of the services rendered. The affidavits of the receivers set forth their understanding that this agreement, particularly in regard to their acceptance of the adjusted rate paid by the City during the arrangement proceedings, represented an effort to alleviate cash flow problems experienced by the receivers and that this arrangement was acceptable as long as the overall settlement negotiations continued in good faith and with some prospect of success.

At this point in the proceeding, apart from the defendants' contention that no contract was ever made between New York City and MediCo, the dispute centers on the appropriate rate of payment for the services rendered by the plaintiffs to the New York City Medicaid patients. The positions of the parties on this issue can be stated briefly.

The plaintiffs allege that New York City agreed to pay for services rendered by the Connecticut Homes at a fixed price rate. The plaintiffs assert that the fixed price rate was set in an amount equal to the

then-effective Connecticut Medicaid rate applicable to providers of a comparable licensing status plus a $7.50 increment. Since, according to the plaintiffs, the prevailing rate was $19.25 at the time the contract was made, the initial fixed rate was set at $26.75. The plaintiffs further contend that the contract provided that the fixed rate was to rise or fall with the Connecticut Medicaid rate and that the $7.50 increment would be maintained. Finally, the plaintiffs contend that the fixed price rate was a unitary rate, that is an integrated rate with no part of the rate allocable to any specific service provided. Hereinafter, I shall refer to the Connecticut Medicaid rate plus the $7.50 increment as the $7.50 Rate in order to distinguish it from the interim adjusted rate which the receivers and New York City agreed to during the Proceedings. The interim rate, which the City has paid, is comprised of the Connecticut Medicaid rate plus a $4.50 increment and shall be referred to as the $4.50 Rate.

According to the plaintiffs, New York City's unilateral decision to discontinue payment of a portion of the $7.50 Rate resulted in a rate reduction for services rendered to the City's Medicaid patients from June 1, 1976 through November 30, 1978[2] of $1,897,132.50. As a result of the interim agreement described above, New York City had paid $1,138,279.50 of that amount through November 30, 1978. The plaintiffs here request a determination that the full $1,897,132.50 properly should have been paid, and therefore seek payment of the unpaid difference between $1,897,132.50 and $1,138,279.50 or $758,853.00. (In addition, to the extent that services have been rendered since November 30, 1978, further amounts presumably would be sought by the plaintiffs.)

The defendants, on the other hand, dispute the plaintiffs' contention that a fixed rate contract was ever entered into by the parties. Rather, the defendants assert that the rate of payment for the services ren-

dered by MediCo and the Connecticut Homes was intended to be cost-related, that is, directly related to and based upon the reasonable costs of the services provided. The defendants argue that, as mandated by Federal and New York State Medicaid law, such cost-related rates are only finally determined after an audit is conducted. Thus, the defendants argue, regardless of whatever rate was initially established and paid by the City for the services rendered by the Connecticut Homes, such payments are subject to audit and possible retroactive adjustment if it is found that the rate of payment is not directly related to the cost of the services provided.

Further disputing the plaintiffs, the defendants maintain that the rate contemplated by the parties was not a unitary rate comprised of the Connecticut rate plus $7.50. Rather, the defendants contend that the $7.50 differential was a separable component of the rate and was allocable as payment for specific services (i.e. ancillary medical services for the New York City Medicaid patients). The defendants argue that the plaintiffs have failed to provide sufficient documentation to demonstrate full performance of these ancillary medical services and have not justified the $7.50 component. Thus contesting the plaintiffs' right to the full $7.50 component, the defendants seek a recovery from the plaintiffs of that portion of the $7.50 component it has paid to the plaintiffs since June 1, 1976. In addition, proofs of claim have been filed by New York City and/or New York State against the Connecticut Homes which attempt to give retroactive impact to the May 7, 1976 rate reduction announcement and state general unsecured claims for the now-disputed $7.50 component of the contract rate actually paid by New York City prior to the Proceedings.

## DISCUSSION

Two matters preliminary to consideration of the merits of the plaintiffs' motion must

---

**2.** November 30, 1978 is the latest date for which figures appear in the record. As will be set forth more fully below, the parties will be required to furnish the Court with more up-to-date figures.

be addressed. The first, a procedural issue, is whether summary judgment is available in the posture of the case. The second is a conflict of laws issue, namely, which law is applicable in the consideration of the contract formation and interpretation dispute.

In ruling on a motion for summary judgment this Court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure.[3] That section provides, in relevant part, that a court is to grant such motion if:

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

■ The plaintiffs' motion herein raises several issues, some of which are appropriately determined in a motion for summary judgment and others which may only be properly decided after a trial. *Hahn v. Sargent,* 523 F.2d 461 (1st Cir. 1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *Feldman v. Birger,* 205 F.Supp. 87 (D.Mass.1962). In such circumstances the Court may proceed to resolve those issues which are properly determined in the motion, and set down for trial those issues which remain. *See,* Rule 56(d) of the Federal Rules of Civil Procedure; 6 *Moore's Federal Practice,* ¶ 56.20[4] at 56–1227. This Court will follow that procedure herein.

The essence of the dispute before the Court is a matter of law and not fact. That is, those key issues of whether a contract was made and, if so, on what terms, as well as the enforceability of certain purported terms of the contract under state and federal law pose legal questions. Since as to these contractual disputes, there is no genuine issue as to any material fact, they are susceptible to resolution upon the motion for summary judgment. *Bloomgarden v. Coyer,* 479 F.2d 201 (D.C.Cir.1973).

It is simply not enough for the defendants to contend, as here, that they disagree with plaintiffs' claim that a contract was made. If summary judgment were only available where the parties themselves agreed on the material facts, it is difficult to imagine any but the most uninventive or uninformed litigants submitting to such judgment. I consider it one of my functions to evaluate the factual allegations placed into evidence to determine whether, indeed, there is any genuine issue as to a material fact. *Green v. Valve Corporation of America,* 428 F.2d 342 (7th Cir. 1970).

However, incident to the above-described contractual issues, and necessarily considered in conjunction with them, is the question of performance by MediCo and the Connecticut Homes. The defendants, particularly New York State, have asserted that in two main areas there has been a failure of performance by MediCo and the Connecticut Homes. The defendants first assert that MediCo failed to reimburse New York City certain Medicare (and Social Security) benefits it was to have collected on behalf of the New York City Medicaid patients in the Connecticut Homes. The defendants assert that no reimbursement was made by MediCo at least through June 1, 1976. Secondly, the defendants contend that MediCo and the Connecticut Homes failed to prepare and submit to New York City, on a regular and systematic basis, various utilization, medical review and social worker reports on the New York City Medicaid patients.

The plaintiffs, on the other hand, maintain that MediCo has fully performed its reimbursement obligations and has properly prepared and submitted to New York City all required documents and reports. Moreover, the plaintiffs contend that even if it were shown that MediCo may have somehow breached these obligations, the defendants have not alleged that any harm resulted from such breach.

---

**3.** Rule 56 of the Federal Rules of Civil Procedure is made applicable to this proceeding by

Rule 756 of the Rules of Bankruptcy Procedure.

■ The plaintiffs and the defendants submitted numerous affidavits and documents in support of their positions on this issue. However, it is not the function of the Court on a motion for summary judgment to resolve factual disputes on the basis of the parties' submissions. Rather the Court need only determine whether a genuine issue as to this material fact exists. In making this determination, the Court is mindful that all doubts concerning the existence or non-existence of a genuine issue of fact are to be resolved in favor of the party against whom the motion is sought. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Thus, in these circumstances this Court should examine the affidavits and other documents submitted in the light most favorable to the defendants—the party opposing the motion. *Hahn v. Sargent, supra* at 464. In order to be successful on their motion, the plaintiffs had the burden to demonstrate the lack of any genuine issue of fact on every relevant issue raised by the pleadings. *Mack v. Cape Elizabeth School Bd.,* 553 F.2d 720, 722 (1st Cir. 1977). On these issues of performance raised by the defendants, the plaintiffs have not met this burden. Therefore, disputes as to those issues must be resolved at a trial.

■ Apart from contesting MediCo's performance of certain reimbursement and reporting obligations, the defendants have not seriously challenged that the quality of the health care and nursing home services rendered by MediCo and the Connecticut Homes were in any way deficient. I have searched the record in these proceedings and have been unable to find any evidence that the health care services provided were the subject of any substantive complaint to MediCo. Moreover, New York City's decision not to remove any of its patients from the Connecticut Homes and, in fact, to transfer additional patients even after announcing its rate reduction is, at least, a tacit acknowledgment by the City that the quality of the services provided by MediCo were satisfactory. In light of these circumstances together with the affidavits and exhibits submitted by the plaintiffs which tend to show that health care services were fully provided, I am satisfied that, except as noted above, MediCo and the Connecticut Homes have fully performed in accordance with their agreement with New York City. Therefore, the trial on MediCo's alleged failure to perform will be limited to those specific items raised by the defendants (i.e. the reimbursement obligation and the reporting requirement), and, of course, the amount of damages which result from the alleged breach.

■ The conflicts of law issue can be stated simply: what law should be applied to the issues of formation and interpretation of the contract allegedly made between MediCo and New York City. The plaintiffs contend that since the contract was negotiated and ultimately made in New York, under Massachusetts conflicts law, New York's law should govern. The defendants do not assert that the law of any other state should control.

■ This Court agrees with the plaintiffs' position that New York law should govern the issues relating to the contract in these circumstances. Under the ruling in *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), it is settled that a federal court should follow the conflicts rule of the jurisdiction in which it sits. Upon application of the prevailing Massachusetts conflicts decisions, the place of the making of the contract governs the nature, validity, and interpretation of the contract. *Molinar v. Western Electric Co.,* 525 F.2d 521, 527–528 (1st Cir. 1975), *cert. denied* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976); *Commissioner of Banks v. Chase Securities Corp.,* 298 Mass. 285, 10 N.E.2d 472 (1937); *Shoe and Leather National Bank v. Wood,* 142 Mass. 563, 8 N.E. 753 (1886). Thus, New York law will be applicable. Coincidentally, New York's conflicts rule mandates a similar result. *Bitterman v. Schulman,* 265 App.Div. 486, 39 N.Y.S.2d 495 (1943). Thus, there does not appear to be any risk of inconsistency in applying the Massachusetts conflicts rule rather than the New York

rule despite some question as to the express applicability of *Klaxon* to adversary proceedings in a bankruptcy case. *See, In re Wallace Lincoln-Mercury Company, Inc.,* 469 F.2d 396, 400 n.1 (5th Cir. 1972).

■ Under settled New York law, as indeed would be the case under long-standing principles of general contract law, a contract is found where essential terms are reduced to a writing whose meaning is reasonably clear as to the identity of the parties, the subject matter of the agreement, and the conditions of their performance. *Justice v. Lang,* 42 N.Y. 493 (1870).

■ The written agreement put forward by the plaintiffs as embodying the undertaking by New York City and MediCo satisfies in each particular the criteria of a legally sufficient and hence fully binding contract. That agreement is contained in a letter dated April 3, 1973 sent to MediCo from Henry J. Rosner, the Assistant Administrator of the Human Services Administration of the Department of Social Services of the City of New York. Briefly, in the letter Mr. Rosner sets forth the precise terms and conditions under which New York City will place its Medicaid patients in the Connecticut Homes, describes the services required to be provided by MediCo, and states the rate of payment required to be paid by New York City. In rather summary fashion, Mr. Rosner's letter closes with the following statement, "This agreement will become effective immediately."

The record demonstrates that the parties operated in accordance with the terms set forth in the April 3, 1973 letter. New York City Medicaid patients were admitted into and provided services by the Connecticut Homes and the City paid for such services under the payment terms contained in the April 3, 1973 letter.

It thus appears beyond dispute that MediCo and New York City did enter into a contract. Three further facts should be noted in that regard. First, as plaintiffs correctly point out, the defendants effectively admit in their responsive pleadings that a contract was made. *U.S. for Use of Automatic Sprinkler Corp. of America v. Merritt-Chapman and Scott Corp.,* 305 F.2d 121 (3d Cir. 1962). Second, the May 7, 1976 rate reduction letter which premises such reduction on a review of the "current contract" relating to New York City Medicaid patients in the Connecticut Homes, is indicative that, whatever its current view, as of May 7, 1976, the City acknowledged the existence of a contractual relationship. Third, at the May 23, 1979 oral argument on the plaintiffs' motion, counsel for New York City conceded that the contract was not the issue, but rather the rate of payment required thereunder.

In view of these facts, I hold as a matter of law that a contract was made between New York City and MediCo on the terms and conditions stated in the April 3, 1973 letter to MediCo. Therefore, since the terms and conditions of the agreement between New York City and MediCo were reduced to a writing which is plain and unambiguous, this Court must first look to that letter in determining these contract-related issues.

The second principal issue is the rate at which New York City agreed to pay for the services rendered by the Connecticut Homes to City Medicaid patients under the contract. On that issue the April 3, 1973 letter clearly states the manner by which the rate is to be calculated:

> The New York City Department of Social Services agrees to pay at the rate of $26.75 per day until such time as the State of Connecticut increases the base rate at which time we will accept the increase in the identical amount. In the event the base rate is reduced by the State of Connecticut from the present rate of $26.75, such reduction will be passed on to the New York City Department of Social Services.

The language of the letter is wholly unambiguous as to payment: New York City agreed to pay a specific rate of $26.75,

subject only to fluctuations in the Connecticut base rate. The plaintiffs have amply demonstrated, and the defendants have not disputed, the nature and calculation of the base rate and the fluctuations thereto. The record is clear that the base rate is in fact the rate at which the State of Connecticut pays for services to Connecticut Medicaid patients in Connecticut nursing homes participating in the Connecticut Medicaid program. The record further shows that the Connecticut base rate on April 3, 1973 was $19.25. Thus, the April 3, 1973 contract contemplates the $7.50 Rate.

Plaintiffs have placed into evidence two documents which support their position that the payment term is comprised of an admittedly fluctuating Connecticut Medicaid rate plus a $7.50 differential. The first document is a January 19, 1976 Memorandum (authored by Mr. Herbert Adasko of New York City's Department of Social Services and author of the previously mentioned May 7, 1976 rate reduction letter). This Memorandum sets forth the calculation of a new rate for the Connecticut Homes for services to New York City Medicaid patients "in accordance with our agreement" by adding $7.50 to the then current Connecticut Medicaid rate. The defendants cannot escape the clear import of this Memorandum which post-dates the written contract of April 3, 1973 and demonstrates how the rate calculation of that contract operates.

A review of the second document, the May 7, 1976 rate reduction letter adds further evidence confirming the plaintiffs' position regarding the payment term of the contract. That letter states in part:

> Effective June 1, 1976, New York City will discontinue paying the nursing homes at the rate of *$7.50 per day* for medical services as delineated in the contract *in addition to the Connecticut daily rate.* [Emphasis added]

The efforts of the defendants to explain away their admissions and writings by representatives of New York City, whose authority has not been questioned in this proceeding, are unconvincing and more importantly, legally insufficient. The defendants submit affidavits replete with statements relating to the period prior to the April 3, 1973 letter and with conclusory statements of law which are themselves inadmissible. Moreover, even if such affidavits set forth facts intended to "clarify" or "amplify" the April 3, 1973 letter, there is no basis for the admission of such evidence. The April 3, 1973 writing is itself unambiguous and I am not inclined to rewrite the City's letter, which it drafted and described as an immediately effective agreement, simply because the payment term happens to be a formula calculable only by reference to changes occurring outside the corners of the document. The issue is not what the Connecticut Medicaid rate was at a particular time, but rather what the contract rate was at all times. *See generally,* 6 *Moore's Federal Practice,* ¶ 56.17[11]. My reading of the contract excludes any prior oral or written evidence extrinsic to the April 3, 1973 letter. *Todem Homes, Inc. v. Freidus,* 84 Misc.2d 1023, 374 N.Y.S.2d 923 (1975); *Bethlehem Steel Co. v. Turner Construction Co.,* 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957); *See also, United States v. Jacobs,* 304 F.Supp. 613, 619 (S.D. N.Y.1969).

As has been repeatedly emphasized in New York law, this Court must resist the temptation to redraft the agreement between New York City and MediCo. *Central Freightways, Inc. v. Deperno,* 60 A.D.2d 750, 400 N.Y.S.2d 946 (1977); *Benson's Plaza v. Great Atl. & Pac. Tea Co.,* 55 A.D.2d 266, 389 N.Y.S.2d 947 (1976). Consequently, I find that the April 3, 1973 contract between New York City and MediCo requires that the City pay for services under the contract at a fixed rate comprised of the Connecticut Medicaid rate applicable to the services and patients in question plus a differential of $7.50, i.e., the $7.50 Rate.

It should be noted that the contract between the parties contains no language

which in any manner suggests that any portion of the rate is specifically allocable to any part of the services to be provided by MediCo and the Connecticut Homes. Rather the language of the contract demonstrates that the rate was to be an all-inclusive and unitary rate as payment for the full package of the health care services to be provided. Thus, the defendants' contention that the $7.50 component was specifically allocable to ancillary medical services is simply inconsistent with the language of the contract and is rejected.

■ The next issue to be addressed is the question of the enforceability of the contract and its fixed payment rate under Federal and New York State Medicaid law. Despite some preliminary skirmishing on the issue, the parties are in accord that the contract between MediCo and New York City is subject to the provisions of governing Federal Medicaid law (42 U.S.C. § 1396 et seq.) and New York Medicaid law (N.Y. Social Services Law § 363 et seq.).

Briefly, Medicaid is a coordinated federal/state enterprise, representing the product of congressional consensus at the national and local levels that medical assistance to needy persons should be funded jointly by federal and state monies. This program is administered through a supervisory mechanism providing, in part, direct payments to qualified providers of health care services under a state-formulated plan in compliance with federal guidelines.

Just as the arms length transaction embodied in the April 3, 1973 contract between New York City and MediCo cannot be recast by judicial intervention, the basic business agreement made by the parties cannot be disturbed where the contract violates no federal or state Medicaid law and is otherwise a valid and enforceable agreement. See, e.g., Briarcliff Haven, Inc. v. Department of Human Resources of State of Ga., 403 F.Supp. 1355, 1364 (N.D.Ga.1975).

Initially, it is clear that New York law authorized the City to enter into the April 3, 1973 contract. The New York Medicaid regulations in effect at the time of the negotiations between MediCo and the City provided:

> Maximum reimbursable rates for payments made to out-of-state providers of medical care and services shall be . . .
>
> (2) For nursing home care, or care in an intermediate care facility, charges in accordance with rates negotiated by the local commissioner of social services. (18 N.Y.Code, Rules and Regulations § 527.1. See also, N.Y. Social Services Law, § 365-a(2)(b).)

Moreover, a March 16, 1973 letter from the office of the Commissioner of the Department of Social Services of the State of New York to the Commissioner of the Department of Social Services of the City of New York specifically authorized the placement of New York City Medicaid patients in out-of-state nursing homes. In the March 16, 1973 letter, the New York State Commissioner specifically noted the language quoted above regarding the maximum reimbursable rate for out-of-state providers. The defendants have not cited any specific authority contradicting or disavowing either the regulations or the letter, but rather advert to the federal Medicaid framework.

Yet, the creation and administration of a state Medicaid program, and especially the determination of payment rates for services thereunder, is not a matter of the imposition of rigid federal standards. Rather, as the Court in *District of Columbia Podiatry Soc. v. District of Columbia,* has stated:

> it is necessary for Medicaid funds to be used in the most economical manner possible, and it has been left to the States, operating within Federal guidelines, to make such economic determinations. 407 F.Supp. 1259, 1264 (D.D.C.1975).

■ Those cases which have treated the propriety or legality of payments under state Medicaid programs do not discuss the issue in terms of prohibitions but of reasonableness and economy. *Medical Soc. of*

*State of New York v. Toia,* 560 F.2d 535, 539 (2d Cir. 1977); *American Medical Ass'n v. Matthews,* 429 F.Supp. 1179, 1195 (N.D. Ill.1977); *District of Columbia Podiatry Soc., supra.* These judicial expressions of reasonableness and economy as operative standards are no more than a reflection of the statutory mandate of the federal enabling legislation. *See,* 42 U.S.C. § 1396a(a)(30). Thus the overriding rule of law is that a provider of health care services under a state Medicaid program has the right to payments "not in excess of reasonable charges consistent with efficiency, economy and quality of care." *Briarcliff Haven, Inc.,* 403 F.Supp. at 1362; 42 U.S.C. § 1396a(a)(30).

The defendants' argument against the fixed $7.50 Rate is that an audit of Medi-Co's costs would show that such rate is in excess of reasonable charges consistent with efficiency, economy, and quality of care. Thus, the fixed price exceeds the allowable ceiling, is in violation of Medicaid law, and is, therefore, unenforceable.

The defendants' argument on this point is, however, somewhat circuitous. That is, in effect, the defendants seek to have it both ways. First, the City negotiates with MediCo and agrees to a rate of payment, presumably because it has determined that rate to be in compliance with Medicaid guidelines (i.e. reasonable charges consistent with efficiency, economy, and quality of care.) Thereafter, the City seeks to adjust that rate on the ground that it is not in compliance with Medicaid law, alleging that such fixed rates are prohibited.

The defendants further argue that the very profitability of MediCo's operations vis-a-vis the City establishes the unreasonableness of the fixed contract rate. This argument is unsound and is also rejected. I do not understand Medicaid law to prohibit profit. On the contrary, the plaintiffs have directed my attention to relevant federal regulations which acknowledge the profit incentive as permissible. As stated in 42 C.F.R. Part 450:

[S]tates may set payment rates prospectively without retrospective adjustment, allowing providers who hold their costs below the payment rate to keep the difference as a profit.

Any provider which can hold its costs below the prospectively set rate still in effect profit by the difference. [This rate setting method has] the advantage of operating as an incentive to efficiency and economy, since the providers will profit in inverse ratios to their costs.

Even at this point of the proceeding, the defendants plead an inability to make any determination regarding the reasonableness of the contract rate which the City negotiated and paid for over three years, other than to argue, in effect, that it is per se violative of Medicaid law simply because the rate is fixed. Defendants contend that the evaluation which would have established the reasonableness of a negotiated rate was deferred until after the services were rendered and payment made. This type of *ex post facto* review of costs and services in the absence of any language in the contract providing for such procedure unfairly prejudices the providers of health care services. In view of the fact that fixed rate contracts are permitted by Medicaid law, the City, if it wanted the right to conduct an audit and retroactive adjustment of the payment rate, should have included such a provision into the contract between the parties. As noted above, the contract contains no such language and thus the City has no right to that payment procedure.

I find that there is no inherent prohibition against the April 3, 1973 fixed rate contract in federal or New York State Medicaid laws. Furthermore, the only case cited by the parties involving comparable factual circumstances tends to support the plaintiffs' argument and reinforces my view that New York City should not be allowed egress from its contractual obligations by arguing that the fixed rate contract it entered is unlawful. In *State Welf. Div., Etc.*

*v. Capital Convalescent Center,* 92 Nev. 147, 547 P.2d 677 (1976), the Supreme Court of Nevada held that the State of Nevada to be bound by a fixed rate Medicaid contract where Nevada had unilaterally converted the payment provision to a cost reimbursement formula without requisite notice to the provider.

For the reasons set forth above, I find New York City to be similarly bound by the April 3, 1973 fixed rate contract. The appropriate rate of payment under such contract is the $7.50 Rate, which rate is not subject to audit or retroactive adjustment.

██ The sole remaining question concerns the extent of New York City's obligations under the contract. The City's May 7, 1976 rate reduction announcement was ineffective. It had reserved no right to such a unilateral revision of the contract terms and is not accorded one under any governing law. Moreover, it elected to maintain its Medicaid patients in the Connecticut Homes (and transferred additional patients) without requesting a bargaining for any corresponding reduction in the services provided to them, thus obtaining the full benefit of its bargain with MediCo but seeking to pay for that benefit at a reduced rate.

Moreover, not only is New York's May 7, 1976 announcement ineffective as a rate reduction, it also did not serve to terminate the contract, where services thereunder continued to be offered and accepted. However, I do not consider either party under an obligation to provide perpetual performance under the contract, despite the absence of a provision regarding duration. *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.,* 178 F.Supp. 655 (1959), *aff'd* 280 F.2d 197 (2d Cir. 1960); *Town of Readsboro v. Hoosac Tunnel & Wilmington R.R. Co.,* 6 F.2d 733 (2d Cir. 1925). Nor do I consider that the absence of such a provision permits either party to terminate the contract at will, as the defendants contend. *Warner-Lambert, supra* at 661; *Town of Readsboro, supra* at 735.

In the circumstances of this case I find that the April 3, 1973 contract entered into by the parties remains in effect, and will continue to remain effective as long as New York City Medicaid patients remain in the Connecticut Homes and are provided services (or until the parties agree to terminate or alter the present contract). *Haines v. City of New York,* 41 N.Y.2d 769, 396 N.Y. S.2d 155, 364 N.E.2d 820 (1977). Therefore, for as long as those New York City Medicaid patients remain in the Connecticut Homes under the April 3, 1973 contract, the appropriate rate of payment for such services is the contract rate—the $7.50 Rate.

Finally, in view of the fact that the record lacks up-to-date figures regarding the amount of services provided by MediCo and the Connecticut Homes as well as the amount owed for such services, the parties are requested to submit an updated accounting to the Court. This accounting should be made in accordance with the findings in this opinion and should be submitted to the Court two weeks before the date set for the trial on the remaining issues.

Accordingly, it is

ORDERED:

(1) That the plaintiffs' motion for summary judgment is partially granted in accordance with the above Memorandum.

(2) That a trial on the issue of performance by MediCo and the Connecticut Homes, as more fully described in the body of this Memorandum, will be set down in due course.